## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

JAMES OWENS
    Et. AL.,

    **Plaintiffs**

    v.                               **Civil Action 15-1945 (JDB)**

BNP PARIBAS S.A.
    ET. AL.,

    **Defendants.**

### AMENDED COMPLAINT

### INTRODUCTION

(1)    This is a civil action for wrongful death, personal injury and other torts pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C.§2333, et. seq., and the laws of the jurisdiction of residence of those Plaintiffs suffering injuries as hereinafter alleged, arising out of the simultaneous Terrorist Bombings ("Terrorist Bombings") upon the Embassies of the United States located in Dar Es Salaam, Tanzania and Nairobi, Kenya on August 7, 1998.

(2)    These Terrorist Bombings were carried out with the assistance of Sudan aided and abetted by the Defendants BNP Paribas S.A. ("BNPP"), BNP North America, Inc. ("BNPP US") and BNP Paribas (Suisse) S.A., ("BNPP Geneva").

(3)    These Terrorist Bombings were carried out immediately by Khalafan Khamis Mohamed; others associated with him, who were members of the Al Qaeda terrorist group headed by Usama Bin Laden; and by the Lebanese terrorist group Hezbollah.

(4)    The Terrorist Bombings were intended to compel the United States Government to withdraw from Africa and the Middle East.

(5)      The Terrorist Bombings were acts of international terrorism.

(6)      The Terrorist Bombings were planned, prepared and carried out with the financial resources knowingly and intentionally provided, from at least 1997 up to and through August 7, 1998, to Sudan, Al Qaeda, and Hezbollah by the Defendant BNPP and by the Defendants BNPP USA and BNPP Geneva which are wholly owned subsidiaries of BNPP.

(7)      From at least 1997 and continuing through at least 2012 the Defendants BNPP, BNPP USA and BNPP Geneva conspired with each other and with Sudanese national banks, and other financial institutions and entities controlled by Sudan, all of which were subject to U.S. sanctions, and other financial institutions located in countries not subject to U.S. sanctions, knowingly, intentionally and willfully to move billions of dollars through the U.S. financial system on behalf of Sanctioned Entities, Specially Designated Nationals (SDNs), and known international terrorist groups including Al Qaeda and Hezbollah, in violation of U.S. sanctions.

(8)      The Defendants BNPP, BNPP USA and BNPP Geneva conspired with these Sudanese national banks and other financial institutions and entities controlled by Sudan despite knowing that these banks were transmitting the funds directly to terrorist organizations being materially supported and/or harbored and/or sheltered by Sudan, including the terrorist organizations Al Qaeda and Hezbollah.

(9)      The United States Treasury Office of Foreign Assets Control (OFAC) describes its Specially Designated National program on its website in these words:

> As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such

2

individuals and companies are called "Specially Designated Nationals" or "SDNs." Their assets are blocked and U.S. persons are generally prohibited from dealing with them.

(10)   The enforcement of U.S. sanctions against Sudan was intended to limit the ability of known terrorist groups and SDNs, such as Hezbollah and Al Qaeda, which were being materially supported by and had a presence in Sudan, to plan, prepare and carry out international terrorist attacks, including during the period 1997-1998.

(11)   The Defendants and each of them knew that the purpose of U.S. sanctions against Sudan, particularly the trade embargo enacted by President Clinton in 1997, was intended to limit the ability of terrorist groups such as Hezbollah and Al Qaeda to prepare and carry out international terrorist attacks, including the time period of 1997-1998.

(12)   Had these sanctions been universally enforced against Sudanese national banks and financial institutions controlled by Sudan in the time period of 1997-1998 the ability of Al Qaeda and Hezbollah to plan, prepare, and carry out terrorist attacks during that time period would have been significantly reduced and the Terrorist Bombings of August 7, 1998 would not have occurred.

(13)   The money transmitted to Al Qaeda and Hezbollah from at least 1997 up to and including August 7, 1998 from Sudanese national banks and other financial institutions controlled by Sudan as a result of actions of the Defendants BNPP, BNPP U.S. and BNPP Geneva materially supported and in fact were necessary for Al Qaeda and Hezbollah to plan, prepare for and to carry out the Terrorist Bombings on August 7, 1998.

3

(14)    All international banks and financial institutions operating within the law observed and enforced the U.S. Sanctions Regime against Sudan between 1997 and August 7, 1998.

(15)    The Defendants BNPP, BNPP U.S. and BNPP Geneva were among the few international banks that did not observe and enforce the U.S. Sanctions Regime against Sudan between 1997 and August 7, 1998.

(16)    Their actions enabled Sudan, Al Qaeda, and Hezbollah to obtain millions of dollars for and from Sudanese national banks and financial institutions controlled by Sudan during that time. This money was necessary for their planning, preparation and ability to carry out the Terrorist Bombings of August 7, 1998.

(17)    The acts of the Defendants were dangerous to human life as Hezbollah and Al Qaeda are violent terrorist organizations with the primary goal of engaging in terrorist violence, including the murder of American citizens.

(18)    The acts of Defendants resulted in the murder, maiming and injury of American citizens on August 7, 1998.

(19)    The acts of Defendants violated multiple statutes under United States Criminal Laws including conspiracy to violate the International Emergency Economic Powers Act and the Trading with the Enemy Act under Title 50, United States Code, Sections 1702 and 1705; the Trading with the Enemy Act under Title 50, United States Code, Appendix 3, 5 and 16 and the Executive Order and regulations issued thereunder, and 18 United States Code, Sections 2339A, 2339B and 2339C.

(20)   The acts of the Defendants transcended national boundaries, enabling sanctioned Sudanese national banks and financial entities controlled by Sudan to receive U.S. dollars without being detected.

(21)   Defendants would arrange for wire transfers to be sent through a United States bank to the account of a Sudanese "satellite" bank located in Africa, Europe or the Middle East. The accounts were held at BNPP Geneva without reference to Sudan. The satellite bank would then transfer the money to Sudanese bank via internal transfer at BNPP Geneva.

## THE PARTIES

### PLAINTIFFS

(22)   Plaintiff James Owens is a resident of the District of Columbia. He has a valid District of Columbia driver's license and is registered to vote in the District of Columbia.

(23)   James Owens was severely physically, emotionally and economically injured in the Terrorist Bombings. He continues to suffer from those injuries.

(24)   James Owens holds a judgment against the Republic of Sudan as a result of the Terrorist Bombings awarded in the United States District Court for the District of Columbia on October 14, 2014 in Civil Action No. 01-2244 (JDB) in the amount set forth below.

(25)   The remaining Plaintiffs are all American nationals or estates, heirs, or survivors of American Nationals who were severely injured, both physically and emotionally; or were killed immediately or later died as a result of the Terrorist Bombings.

(26)   The remaining Plaintiffs are residents of different states throughout the United States.

(27)   The remaining Plaintiffs also were awarded judgments against the Republic of Sudan as a result of the Terrorist Bombings in the United States District Court for the District of

Columbia in Civil Action No. 01-2244 (JDB) and in case number Civil Action No. 10-356 (JDB) in the amounts set forth below.

(28)     The remaining Plaintiffs in their individual and representative capacities are: James Owens, Gary Robert Owens, Barbara Goff, Betty Owens Evely, Frank B. Pressley, Jr., Yasemin B. Pressley, David A. Pressley, Thomas C. Pressley, Michael F. Pressley, Berk Pressley, Jon B. Pressley, Marc Y. Pressley, Sundus Buyuk, Frank Pressley, Sr., Bahar Buyuk, Serpil Buyuk, Tulay Buyuk, Ahmet Buyuk, Dorothy Willard, Ellen Karas, Donald Bomer, Michael James Cormier, Patricia Feore, George Karas, Nicholas Karas, Alice M. Hirn (Personal Representative of the Estate of Clyde M. Hirn), Patricia K. Fast, Paul Hirn (Personal Representative of the Estate of Inez P. Hirn), Paul Hirn, Eloise Hubble, Margaret Baker, Joyce Reed, Worley Lee Reed, Cheryl L. Blood, Bret W. Reed, Flossie Varney, Linda Jane Whiteside O'Donnell (Personal Representative of the Estate of Ruth Ann Whiteside), Lydia Hickey, Howard Sparks, Sr., Howard Sparks, Jr., Michael Sparks, Tabitha Carter, Loretta Paxton, Lora Murphy, Linda Shough, Laura Harris, Lydia Hickey (Personal Representative of the Estate of Leroy Moorefield), Ellen B. Moorefield (Personal Representative of the Estate of Roger Leroy Moorefield), Judy L. Moorefield (Personal Representative of the Estate of Rodney Moorefield), Gary Spiers, Victoria Q. Spiers, Victoria J. Spiers, Richard David Patrick, Rolando Quilacio, Suszn Quilacio Nicholas, Candelaria Quilacio Franceliso, Edilberto Quilacio, Victoria Q. Spiers (Personal Representative of the Estate of Eulogio Arendaen Quilacio), Victoria Q. Spiers (Personal Representative of the Estate of Julita A. Quilacio), Rizwan Khaliq, Jenny Christiana Lovblom, Imtiaz Bedum, Yasir Aziz, Imran Khaliq, Kamran Khaliq, Naurin Khaliq, Irfan Khaliq, and Tehsin Khaliq.

## DEFENDANTS

### BNPP

(29)    Defendant BNPP is a corporation formed under the laws of France, with its principal place of business located at 12 Rue Chauchat, 75450 Paris CEDEX 09, France.

(30)    According to its 2013 Annual Report, Defendant BNPP is a French multinational bank and financial services company with its global headquarters in France. It is the largest bank in France and one of the five largest banks in the world in terms of total assets. It describes itself on its website as "a major global bank ... active in 75 countries," employing 18,670 persons in the Americas with a worldwide total of 40,000 employees in retail banking, which includes the international movement and exchange of currency.

(31)    BNPP operates extensively in the United States and employs a substantial number of employees in the United States. BNPP's English Language Website states:

That it "...has been present in the United States since the late 1800s and currently has over 16,000 employees in North America. The region is a key hub for the Bank's global network of 75 countries and nearly 188,000 employees."

(32)    BNPP advertises on its English language website that it has a substantial presence and contacts in the United States, its English Language website noting that it operates bank networks in the United States and that it operates the seventh largest bank holding company in the western United States.

### BNPP U.S.A.

(33)    Defendant BNPP U.S.A. is a corporation formed under the laws of Delaware with its principal place of business located at 787 Seventh Avenue, New York, NY 10019.

(34)    BNPP U.S.A is a wholly owned subsidiary of BNPP.

(35)    Defendant BNPP U.S.A. employs a substantial number of employees in the United States and does significant business in the United States.

(36)    BNPP U.S.A. has moved billions of dollars through the U.S. banking system on behalf of sanctioned entities to evade U.S. sanctions against Sudan on behalf of terrorist organizations, including Al Qaeda and Hezbollah.

## BNPP GENEVA

(37)    The Defendant BNPP Geneva is a corporation formed under the laws of Switzerland with its principal place of business located at Place de Holland 2, 1204 Geneva, Switzerland. It is a wholly owned subsidiary of BNPP.

(38)    The Defendant BNPP Geneva describes itself on its English Language website as one of the largest banks in Switzerland.

(39)    BNPP Geneva has significant business dealings and contacts with the United States and purposefully avails itself of the United States banking market.

(40)    BNPP Geneva has moved billions of dollars through the U.S. banking system on behalf of sanctioned entities to evade U.S. sanctions against Sudan on behalf of terrorist organizations, including Al Qaeda and Hezbollah.

## JURISDICTION AND VENUE

(41)    This court has jurisdiction over this matter pursuant to 28 U.S.C. §§1330-1332, 1367 and 18 U.S.C. §§7, 2333-2334.

(42)    This Court has supplemental jurisdiction over those persons who suffered damages as a result of the attack on August 7, 1998, in accordance with 28 U.S.C.A. §1367.

(43)    This Court is a proper venue for the trial of this action in accordance with 18 U.S.C. §2334 and pursuant to 28 U.S.C. §1391(f)(4) and the rules of pendent venue.

## ALLEGATIONS OF CLAIMS AND STATEMENT OF FACTS

(44)    Defendants, each of them and together, committed acts of international terrorism.

    a.    The acts of Defendants were violent acts and acts and act dangerous to human life.

    b.    The Defendants provided extensive banking services to Sudan, Hezbollah, and Al Qaeda which permitted them to carry out the Terrorist Bombings.

    c.    Acts of Defendants were dangerous to human life because Sudan, Hezbollah, and Al Qaeda were violent sponsors of terrorism and terrorist organizations with a mission to engage in terroristic violence, including the murder of United States nationals.

(45)    Defendants violated criminal laws of the United States.

    a.    Defendant BNP Paribas has admitted violating United States criminal statutes.

    b.    The conduct of BNP USA and BNP Switzerland, in conspiracy with BNP Paribas, violated the same criminal statutes admittedly violated by BNP Paribas.

    c.    Defendants provided material support and resources, including financial services, knowing and intending that they were to be used in preparation for, and carrying out, actions, including the Terrorist Bombings that would violate U.S. terrorism-related criminal statutes.

9

d. Defendants knew that Sudan, Hezbollah, and Al Qaeda were connected to terrorism.

e. Defendants knowingly, purposefully, and willfully gave, donated, transmitted, raised, and received funds for Sudan, Hezbollah, and Al Qaeda and maintained bank accounts and processed deposits and withdrawals on their behalf.

f. Defendants knew or intended that funds they processed would be used to carry out acts intended to cause death or serious bodily injury to civilians, including the Terrorist Bombings, and that the purpose of those acts was to cause the United States to do or abstain from doing certain acts.

g. The Terrorist Bombings unlawfully took human life with malice aforethought.

h. The Terrorist Bombings were accomplished through the unlawful detonation of a weapon of mass destruction against nationals of the United States while those persons were outside the United States.

i. The Terrorist Bombings were accomplished by the delivery, placement, discharge, and detonation of an explosive device into a place of public use with the intent of causing death or serious bodily injury.

j. Defendants provided material support and resources to Sudan, Hezbollah, and Al Qaeda, foreign terrorist organizations.

k. Defendants knew that the resources they provided would be used for conducting acts if international terrorism.

l. Defendants' actions resulted in terrorist acts, including the Terrorist Bombings.

(46)     The acts of Defendants appear to be and were intended to intimidate civilians, influence government policy, or affect government conduct.

## SUDAN'S TERRORIST GOVERNMENT

(47)     Sudan was named a State Sponsor of Terrorism by the United States State Department in 1993 and has maintained that designation at all relevant times since.

(48)     The Secretary of State designates State Sponsors of Terrorism as:

"Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism are designated pursuant to three laws: section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act."

Taken together, the four main categories of sanctions resulting from designation under these authorities include restrictions on U.S. foreign assistance; a ban on defense exports and sales; certain controls over exports of dual use items; and miscellaneous financial and other restrictions.

(49)     As of 1997, up to and including the time of the bombings on August 7, 1998, and at all times relevant to this complaint, the government of Sudan was a major sponsor of international terrorism.

(50)     In May of 1997 a hearing was held before the Subcommittee on African Affairs of the Committee on Foreign Relations of the United States Senate to address the ongoing threat of Sudan government's sponsorship of international terrorism.

(51)     Senator John Ashcroft stated in his introduction to that hearing,

"One of the most serious of these new national security threats is the rise of international terrorism. We are holding this hearing today in the Subcommittee on

11

African Affairs to address the menace of terrorism as sponsored by the Government of Sudan. Since first being designated a State sponsor of terrorism in 1993, Sudan has risen quickly in the ranks of infamy to join Iran as the worst of State sponsors of terrorism.

Sudan harbors elements of the most violent terrorist organizations in the world: Jihad, the armed Islamic group, Hamas, Abu Nidal, Palestinian Islamic Jihad, Hizbollah, and the Islamic Group are all present in terrorist training camps in Sudan. These terrorist groups are responsible for hundreds of terrorist attacks around the world that have taken thousands of lives."

(52)    At the same hearing, Steven Emerson, a Middle East Affairs Analyst, author, and terrorism expert, testified regarding Sudan's role in international terrorism in 1997.

(53)    In the transcript of the Senate Subcommittee Hearing, appearing with Mr. Emerson's remarks starting at page 41, Mr. Emerson is described as:

(54)    "an author, analyst and investigator specializing in the field of radical Islamic fundamentalist movements and terrorist organizations. He is the Executive Producer of the critically acclaimed documentary 'Jihad in American,' which aired on PBS in 1994. The recipient of numerous national prizes for his investigations, Mr. Emerson is at work at present on a documentary series on terrorism and is also completing a book. He frequently writes for national periodicals and is the previous author of four books on terrorism the Middle East and U.S. counter-terrorism units."

(55)    Mr. Emerson testified at the Senate Subcommittee Hearing that not only did Sudan's government sponsor terrorism in 1997, but the government itself directly participated in the planning of terrorist acts.

(56)    Mr. Emerson also testified as to the nexus between any outside financial transactions with Sudan and terrorist acts. Starting at page 41 of the Senate Subcommittee transcript:

"There can be no denying that Sudan plays a pivotal role in the worldwide operations of militant Islamic groups bent on imposing the Sha'aria—the body of Islamic law—and confronting through murderous violence any regime or institution that stands in its way. Sudan, arguably the largest terrorist camp in the world, has become a central player in supporting, sponsoring and enhancing radical terrorist groups that have carried out—or at least tried to carry out—the most horrific violence that the world has witnessed in decades. A veritable 'Murder Incorporated,' Sudan has been directly tied to the entire spectrum of radical Islamic violence that has plagued not only the Middle East but the West as well. Unless some type of brakes are forcibly applied to the spinning vortex of terrorism emanating from Sudan, the attacks on our friends and on ourselves will only continue..."

(57)    Mr. Emerson went on to testify, in reference to Sudan's government leadership participating in acts of terrorism:

"Although Iran and Sudan are equally culpable in sponsoring and orchestrating terrorist attacks, Sudan, under the leadership of Dr. Hassan al-Turabi, the head of the ruling National Islamic Party and de facto chief, has been responsible for helping to create the global Muslim brotherhood movement and subsidiary organizations. It would be wrong and self-deceiving to underestimate the success and guile of Dr. Turabi in both building up a fledgling Muslim brotherhood movement into an actual State, and, more critically, forging alliances between myriad branches and leaders of

radical Islam. Dr. Turabi's popular Arab Islamic Conferences—three have been held so far—feature the full panorama of a global militant Islamic movement, including Islamic delegations and leaders not only from the Middle East, but from Spain, France, Italy, Argentina, Mexico, Canada, Kenya, and even the United States."

(58)   Mr. Emerson further testified:

"Interestingly, the only group whose organization is directly tied to a government is the National Islamic Front, or the Islamic Fundamentalist Party, which controls Sudan under the *de facto* leadership of Dr. Hassan al-Turabi. Indeed, the evidence produced at the trial [World Trade Center Bombing] and other information obtained by prosecutors shows that top officials of Sudanese regime not only had advance knowledge of the second series of plots, but actively facilitated in their preparation."

(59)   Mr. Emerson also stressed the importance of enforcing economic sanctions against Sudan, noting that any financial dealings with Sudan would give economic aid and assistance to Sudan's terrorist government and its terrorist groups:

"The hearing today is not about Islam but about the policies of a rogue regime and how the United States should formulate and implement its counter-terrorist policies to safeguard its vital national security interests. If the intent of Congress in the 1996 anti-terrorist legislation and in earlier Congressionally-directed initiatives was to pressure countries which actively support or encourage international terrorism by denying them full access to the American market as well as to American technology, then any exemptions to this policy predicated on the notion that such trade is determined 'not to have an impact on any potential act of terrorism' is a meaningless and unjustified exemption. Regimes which support terror—whether they pull the trigger or pay others to

pull the trigger—cannot be compartmentalized into an 'evil' government sector and a private 'good' sector. While not everyone living in a terrorist-regime necessarily supports terrorism, the regime itself is the ultimate beneficiary of any increased trade and technology. When dealing with totalitarian terrorist-supporting regimes, any policy that can claim to substantively differentiate between trade that has no impact on terrorism and that which has an impact on terrorism is an illusion. While dollars may accrue to exporters in the short term by exploiting the unintended exemption, the long term injury to American interests by continuing to build up a terrorist infrastructure to be used against the West is not only incalculable, but unfathomable in the belief that policymakers at the State Department would accept it."

(60)    During 1997 up to and including August 7, 1998 Sudan permitted both the terrorist organizations Al Qaeda and Hezbollah to be present in Sudan and aided them in their terrorist activities, including the Terrorist Bombings.

## SANCTIONS IMPOSED BY THE UNITED STATES

(61)    On August 12, 1993, the U.S. Secretary of State added Sudan to its list of state sponsors of terrorism. The Department of State's Patterns of Global Terrorism 1993 report noted, "Despite several warnings to cease supporting radical extremists, Sudanese government continued to harbor international terrorist groups in Sudan." The report also highlighted Sudan's close ties to Iran, noting that the regime provided meeting locations, transit points and safe havens for "Iran-backed extremist groups" as well as a "disturbing relationship with a wide range of Islamic extremists".

(62)    Among the sanctions imposed upon Sudan for being named a State Sponsor of Terrorism were restrictions on U.S. foreign assistance, a ban on defense exports and sales, certain controls over exports of dual use items, and miscellaneous financial and other restrictions.

(63)    On November 3, 1997, by Executive Order 13067 of November 3, 1007, President William J. Clinton imposed a complete trade embargo on Sudan pursuant to "the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.). and section 301 of title 3, United States Code." (Executive Order 13067 Paragraph One)

(64)    President Clinton imposed the embargo based upon a finding that:

"...the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and hereby declare a national emergency to deal with that threat."(Executive Order 13067 Paragraph 2)

(65)    Executive Order 13067 and related regulations made it unlawful to export goods and services from the United States, including U.S. financial services, to Sudan without a license from the Office of Foreign Assets Control of the Department of State (OFAC). Executive Order 13067 section 4(c), (d) and (e) expressly prohibited:

"(c) the facilitation by a United States person, including but not limited to brokering activities, of the exportation or re-exportation of goods, technology, or services from Sudan to any destination, or to Sudan from any location.

> (d) the performance by any United States person of any contract, including a financing contract, in support of an industrial, commercial, public utility, or governmental project in Sudan;
>
> (e) the grant or extension of credits or loans by any United States person to the Government of Sudan."

(66)    Executive Order 13067 section 4(b) defined a United States person to be any individual or "entity" including a "partnership, association, trust, joint venture, corporation, or other organization." Section 4(c) defined the term "Government of Sudan" to include the "Government of Sudan, its agencies, instrumentalities and controlled entities, and the Central Bank of Sudan." By its terms, Executive Order 13067 prohibited all United States banks and financial institutions from processing financial transactions for the Government of Sudan, its agencies, instrumentalities and controlled entities.

(67)    As of January 1, 1998, all of Sudan's national and major commercial banks were designated Specially Designated Nationals by OFAC. These banks included Agricultural Bank of Sudan, Bank of Khartoum, Bank of Khartoum Group, Bank of Sudan, El Nilein Bank, El Nilein Industrial Development Bank, ICDB (a.k.a. Islamic Cooperative Development Bank), Industrial Bank Company for Trade and Development, Limited, Industrial Bank of Sudan, Islamic Co-operative Development Bank, National Export Import Bank, People's Co-operative Bank, Sudan Commercial Bank, Sudanese Estates Bank, Sudanese Savings Bank, and Unity Bank.

(68)    This designation was in addition to the embargo imposed by Executive Order 13067.

(69)    Enforcement of these sanctions by the international financial community was crucial in 1997-1998 to limit the ability of Sudan and the terrorist groups that to which it provided material assistance to continue to plan, prepare, and carry out terrorist attacks.

(70)    Had these sanctions been enforced by the Defendants BNPP, BNPP USA and BNPP Geneva, Al Qaeda and Hezbollah would not have been able to receive the significant financial support that they received from Sudan, their ability to plan, to prepare, and to carry out terrorist attacks would have been significantly reduced, and the Terrorist Attacks on the American Embassies on August 7, 1998 would not have occurred.

(66) All law abiding international banks and financial institutions observed and enforced the U.S. Sanctions Regime in 1997-1998.

(71)    The Defendant financial institutions were among the few who did not.

(72)    The above described illegal financial actions of the Defendants greatly weakened the U.S. embargo against Sudan in 1997-1998, enabling Al Qaeda and Hezbollah to receive millions of dollars from Sudan and to plan, prepare and carry out the Terrorist Bombings.

(73)    On July 9, 2014, BNPP pleaded guilty in the United States District Court for the Southern District of New York to conspiring with banks and other entities located in or controlled by countries subject to U.S. sanctions, including Sudan, Iran and Cuba; other financial institutions located in countries not subject to U.S. sanctions; and others known and unknown, to knowingly, intentionally, and willfully move at least $8,833,600,000 through the U.S. financial system on behalf of Sanctioned Entities in violation of U.S. sanctions laws, including at least $4.3 billion that involved SDNs.

(74)     The majority of the money moved through the U.S. financial system starting in at least 1997 involved Sudanese banks, financial institutions, and other entities controlled by Sudan on behalf of Sanctioned Entities and SDNs materially supported by Sudan.

(75)     BNPP pleaded guilty to a one count felony Information alleging Conspiracy to Violate the International Emergency Economic Powers Act and the Trading with the Enemy Act under Title 50, United States Code, Sections 1702 and 1705; the Trading with the Enemy Act under Title 50, United States Code Appendix, Sections 3, 5, and 16; and the executive orders and regulations issued thereunder.

(76)     Although the time period to which BNPP pleaded guilty to start in at least 2004 and went through 2012, BNPP admitted that the conspiracy and the acts forming the basis of the conspiracy actually started in 1997.

(77)     BNPP admitted that it was:

> "...part and an object of the conspiracy that BNPP, the defendant, and others known and unknown, willfully and knowingly would and did violate executive orders prohibiting exportation, directly and indirectly, of services from the United States to Sudan and Iran, and the evasion and avoidance of the aforementioned prohibition, to wit, BNPP willfully and knowingly structured, conducted, and concealed U.S. dollar transactions using the U.S. financial system on behalf of banks and other entities located in or controlled by Sudan, and on behalf of an entity located in Iran, in violation of IEEPA, Title 50, United States Code, Section 1705(a) and (c); the Sudanese Sanctions Regulations, Title 31, Code of Federal Regulations Sections 538.205 and 538.211, Executive Order 13067, Section 2(b) and (g) (Nov. 3, 1997)..."

(78)    In support of this guilty plea a Statement of Facts dated June 28, 2014 was signed by all parties and entered into the record.

(79)    The Statement of Facts was signed by a BNPP corporate representative authorized to sign by the Board of Directors of BNPP; Georguei Dirani, an attorney for BNPP; and two assistant United States Attorneys.

(80)    On the signature page of the Statement of Facts, BNPP and all parties to the agreement stipulated that had the case gone to trial the United States would have proved the facts "beyond a reasonable doubt."

(81)    BNPP admitted in the Statement of Facts that the conspiracy started in 1997 when, in order to evade the 1997 U.S. embargo, BNPP Geneva agreed to become Sudan's prime correspondent bank in Europe. A Sudanese national bank directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe.

(82)    In Paragraph 19 of the Statement of Facts BNPP stipulated as follows:

> "In 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP
> Geneva agreed to become the sole correspondent bank in Europe for Sudanese
> Government Bank 1, which, as noted above, was designated by OFAC as an SDN.
> Sudanese Government Bank 1 then directed all major commercial banks located
> in Sudan to use BNPP Geneva as their primary correspondent bank in Europe. As
> a result, all or nearly all, major Sudanese banks had U.S. dollar accounts with
> BNPP Geneva…"

(83)    By having all major Sudanese banks with U.S. dollar accounts banking with BNPP Geneva, as of 1997, the Defendant BNPP Geneva, with the full knowledge and consent of BNPP and BNPP USA, became the *de facto* bank of Sudan.

(84)    BNPP admitted in the stipulated Statement of Facts that in the months and years following the decision to use "U.S. Bank 1" as BNPP Geneva's principal means for clearing U.S. dollar transactions with Sanctioned Entities in 1997 that BNPP compliance and legal personnel fully realized that BNPP was circumventing U.S. sanctions against Sudan.

(85)    In Paragraph 31 of the Statement of Facts BNPP stipulated:

"In the months and years that followed the decision to use U.S. Bank 1 as BNPP Geneva's principal means for clearing U.S. dollar transactions with Sanctioned Entities [in 1997], senior BNPP compliance and legal personnel repeatedly recognized BNPP's role in circumventing U.S. sanctions against Sudan, and yet allowed these transactions to continue…"

(86)    In addition, starting from at least 1997 up to and through August 7, 1998, the Defendants became key to allowing Sudan to sell oil through the United States banking system, thereby allowing Sudan to raise money to buy arms and supplies for and otherwise support Hezbollah, al Qaeda, and other terrorist organizations.

(87)    BNPP stipulated that in 1997, in order to further evade the total trade embargo of 1997 and other United States sanctions, BNPP Geneva, with the knowledge and consent of BNPP and BNPP USA, established relationships with "satellite banks" located in Africa, Europe and the Middle East, some of whose sole purpose was to evade U.S. sanctions.

(88)    In pages 6-7 of Consent Order Under New York Banking Law § 44, entered into the record in New York State Court in support of BNPP's guilty plea to falsifying records in connection with the above conspiracy, BNPP stipulated:

"In 1997, notwithstanding the publically proclaimed designation of the Republic of Sudan as a terrorist state by the United States Department of State on August 12, 1993, the Defendant, BNP PARIBAS S.A., a corporation organized in accordance with the laws

of the Republic of France, acting with and through its wholly owned subsidiaries, the
Defendant, BNP PARIBAS USA, and BNP Paribas Geneva:

> "'established account relationships with unaffiliated regional banks ("Regional
> Banks") located in Africa, Europe and the Middle East, eventually nine in all,
> some with no other business purpose than to clear payments for Sudanese clients.
> The accounts with the Regional Banks were created and established to provide a
> means to circumvent U.S. sanctions.'"

(89)    This Consent Order was titled "In the Matter of BNP Paribas, S.A., New York
Branch" and was signed on behalf of BNP Paribas by Jean-Laurent Bonnafacé, Chief Executive
Officer.

(90)    Defendant BNPP also admitted, in Paragraph 23 of the Statement of Facts, to the
use of the satellite banks starting in 1997 to evade United States Sanctions:

> "In addition to omitting references to Sudan in U.S. dollar payment messages, another
> method used by BNPP Geneva to evade the U.S. embargo against Sudan involved, as
> noted above, the use of unaffiliated, non-Sudanese, non-U.S. banks (referred to internally
> at BNPP Geneva as 'satellite banks') to help disguise the true nature of transactions with
> sanctioned Sudanese banks. BNPP Geneva began its relationship with many of these
> satellite banks shortly after the imposition of U.S. sanctions against Sudan in 1997, and
> the vast majority of the satellite banks' business with BNPP Geneva involved facilitation
> of U.S. dollar payments for sanctioned Sudanese banks."

(91)    Defendant BNPP described in Paragraph 24 of the Statement of Facts how the
satellite bank system worked to evade U.S. sanctions::

"Specifically, BNPP Geneva utilized the satellite banks in a two-step process designed to enable BNPP Geneva's Sudanese clients to evade U.S. sanctions. In the first step, a Sudanese bank, seeking to move U.S. dollars out of Sudan transferred funds internally within BNPP Geneva to a BNPP Geneva account specifically maintained by a satellite bank to facilitate U.S. dollar transfers from Sudan. In the second step, the satellite bank transferred the money to the Sudanese bank's intended beneficiary through a U.S. bank without reference to the Sudanese bank. As a result, to the U.S. bank, it appeared that the transaction was coming from the satellite bank rather than a Sudanese bank. A similar process enabled sanctioned Sudanese banks to receive U.S. dollars without being detected: the originator of the transaction sent a wire transfer through the United States to the satellite bank's account at BNPP Geneva without reference to Sudan, and the satellite bank then transferred the money to the Sudanese bank via internal transfer at BNPP Geneva. Moreover, in order to further disguise the true nature of the satellite bank transactions, employees at BNPP Geneva frequently worked with the satellite banks to wait between one and two days after the internal transfer before making a dollar-for-dollar, transaction-by-transaction clear of funds through the United States, artificially delinking the U.S. transfer of funds from the prior transfer involving the satellite banks so that financial institutions in the United States and U.S. authorities would be unable to link the payments to the involved Sanctioned Entity. In fact, BNPP employees internally proposed getting the satellite banks "accustom[ed]…to spacing out the gap between covers they execute with their U.S. correspondents to the extent possible."

(92)    In Paragraph 31 of the Statement of Facts BNPP admitted that the satellite bank system succeeded in avoiding U.S. sanctions:

"Ultimately, BNPP Geneva successfully used the satellite bank structure – which had

no business purpose other than to help BNPP's Sudanese clients evade the U.S. embargo

– to process thousands of U.S. dollar transactions, worth billions of dollars in total, for

Sudanese Sanctioned Entities without having the transactions identified and blocked in

the United States."

(93)    BNPP admitted in Paragraph 15 of the Statement of Facts that in carrying out

these illicit transactions, BNPP's agents and employees were acting within the "scope of their

duties which were intended at least in part, to benefit BNPP."

(94)    The Defendants created a special bureau, called "GC8," to manage their illicit

banking activities.

(95)    The Defendants knew that their conspiracy to provide Sudanese national banks

access to the U.S. financial system supported terrorist organizations in the Sudan between 1997

and 1998. In Paragraph 26 of the Consent Order BNPP admitted that as the principal foreign bank

for the Government of Sudan, "BNPP Geneva had an essential role in the Government of Sudan's

financial stability. BNPP Geneva held accounts for a financial institution owned by the

Government of Sudan since 1977 for, among other purposes, illicit U.S. dollar clearing."

(96)    In Paragraph 20 of the Statement of Facts BNPP stipulated:

"BNPP's central role in providing Sudanese Financial institutions access to the

U.S. financial system, despite the Government of Sudan's role in supporting

terrorism and committing human rights abuses, was recognized by BNPP

employees."

(97)    BNPP's own compliance personnel were also aware of BNPP's use of satellite

banks to process transactions with Sanctioned Entities.

(98)   In Paragraph 27 of the Statement of Facts BNPP stipulated:

"BNPP Geneva's methods of evading U.S. sanctions against Sudan - including the omission of references to Sudan from wire messages involving Sanctioned Entities and the use of satellite banks to process transactions for sanctioned Sudanese banks - were known to and condoned by senior compliance and business managers at both BNPP Geneva and BNPP Paris."

(99)   Paragraph 27 of the Statement of Facts also describes how the Defendants hid their illegal banking transactions by omitting references to Sudan from wire messages involving Sanctioned Entities. BNPP admitted in Paragraph 12 of the Consent Order that in BNPP Geneva's back office "there was policy to strip, amend and omit elements of U.S. dollar payment messages that could serve to identify Sanctioned Parties, including most prominently, those related to Sudan." BNPP admitted in Paragraph 10 of the referred to Consent Order that through BNPP Geneva they created deceptive schemes and transaction structures to conceal thousands of illegal Sudanese transactions, valued at more than $20 billion dollars, from scrutiny by U.S. financial institutions, regulators and authorities.

## HOW THE TERRORIST BOMBINGS WERE PLANNED AND EXECUTED

(100)   Al-Qaeda, Arabic for "the Base," is an international terrorist network founded by Osama bin Laden in the late 1980s. It seeks to rid Muslim countries of what it sees as the profane influence of the West and replace their governments with fundamentalist Islamic regimes. It is committed to violent action to that end.

(101)   Hezbollah  is an organization of Lebanese Muslims who are adherents of the Shiite faction of Islam.  It represents itself as "an Islamic freedom fighting movement," which views any presence of the United States in the Near East as contrary to the religious beliefs of its

members.  It advocates the expulsion of the United States from the Middle East and is committed to violent action to that end.  At all times relevant to this action, Hezbollah gave extensive support to Al Queda to carry out a wide-ranging program of terrorism against the United States, including the Terrorist Bombings in Kenya and Tanzania on August 7, 1998.

(102)  Both Al Qaeda and Hezbollah at all times relevant herein were Specially Designated Nationals.

(103)  At all times relevant herein both Al Qaeda and Hezbollah had a presence in Sudan.

(104)  On October 15, 2014, the following findings of fact were made by the Honorable John Bates in finding of liability against the Republic of Sudan and the Minister of the Interior of the Republic of Sudan for aiding and abetting Al Qaeda and Hezbollah in planning and executing the Terrorist Bombings based upon clear and convincing evidence, in the United States District Court for the District of Columbia in Civil Action No. 01-2244 (JDB) and in Civil Action No. 10-356 (JDB):

    a.  In the early 1990s, the government of Sudan sent overtures to Bin Laden and Al Qaeda, inviting the group to relocate en mass from Afghanistan to Sudan. Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant, who served Bin Laden in Afghanistan as well as Sudan, learned of the impending relationship between Al Qaeda and the Sudanese government for the first time at one of the meetings in Peshwar, Pakistan that occurred between the Sudanese government, Bin Laden and other Al Qaeda members.  The representatives of the Sudanese government, promised the support of that government should Al

Qaeda come to the Sudan.  Al Qaeda thereafter used Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to Sudan.

b.  At all times relevant to this action, the government of Sudan was run by President Field Marshall Omar Hassan al-Bashir, the head of state of Sudan, through an alliance of the military and the National Congress Party, formerly the National Islamic Front.

c.  Al-Fadl went to Sudan to secure residential and commercial property for Al Qaeda.  The purpose of some of the property was to provide a safe place to train Al Qaeda militants.

d.  Essam Al Riddi, a pilot who worked for Bin Laden in 1993, stated that he purchased a plane for Bin Laden, oversaw its refurbishment, and flew it to Khartoum in 1993.

e.  While Al Riddi stayed in Khartoum, he dined with Bin Laden and had several discussions with him.  Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse.  The Sudanese government provided security for Al Qaeda and 15-20 Sudanese men dressed in Sudanese army fatigues were stationed at the villa and were using jeeps with Sudanese army license plates.

f.  Al Qaeda provided Al Riddi with a plane from Sudan Airlines to ferry militants to Nairobi.  Bin Laden discussed the possibility of Al Riddi transporting Stinger missiles from Pakistan to Sudan.

g.  Bin Laden assured Al Riddi that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

h.  The training that Al Qaeda carried out in Sudan included explosives training. The loud noises drew the local police to the source of the explosions after complaints from neighbors, and Al Fadl was among those arrested as a result. He was quickly released due to the close relationship between Al Qaeda and the Sudanese intelligence service (a Defendant in this action). According to Al-Fadl:

> "We call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that. And they take us to the jail, and they say you shouldn't do that, we tell you to refresh ["Refresh" meant refresher courses for the militants who had already received training in the past.], not to make real explosives."

i.  Al-Fadl saw a letter from President al-Bashir that explained the relationship between Al Qaeda and the Sudanese intelligence. With the explicit approval of Bin Laden, Al-Fadl also personally worked with the Sudanese intelligence officers.

j.  The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the activities described in this Complaint.

k.  The intelligence officers were organized into a "delegation office" to meet the needs of the Al Qaeda group in Sudan. There was an explicit fear that agents from foreign governments or informants would disclose Al Qaeda's location and activities in Sudan. Some of these informants were consequently jailed in Sudan. Al-Fadl would identify suspicious foreigners to the Sudanese intelligence as Al Qaeda sought to keep its presence and activities in Sudan secret.

l.  The delegation office, staffed with Sudanese intelligence officers, also helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country.  On one trip, the weapons were taken out of the country by delivering four crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

m.  The letter from President al-Bashir was essential to the operations unit of the Al Qaeda terrorist group, which was secretly training in Sudan.  The letter allowed Al Qaeda members, such as Al Fadl, to bypass tax and customs collection on international shipments and guaranteed that their shipments, coming or going, would not be inspected.

n.  Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized infantry.  The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

o.  The delegation office, the Sudanese government's go-between with Al Qaeda, also protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigrations office at the airport.  This was important because if Al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

p.  Al Qaeda also set up a number of companies that provided it with critical income so that it could continue its growth and evolution into a lethal

organization with global reach.  Al Qaeda did not come to Sudan to operate as a regular business enterprise.  Rather, the purpose of the investment in Sudanese business activity was adjunct to its mission of aggression against the West, as explicitly stated by Bin Laden himself:

> "Our agenda is bigger than business. We are not going to make business here, but we need to help the government and the government help our group, and this is our purpose."

q. Among the Sudanese companies founded by Al Qaeda were: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the Al Themar al Mubaraka, which ran the farm where Al Qaeda trained its militants in explosives.  The Hijra Construction Company purchased explosives for its road and bridge building activities.

r. Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms and residential houses.  Bin Laden even had a bank account in Khartoum in his true name.  Al Qaeda purchased some of the companies directly from the Sudanese government.  The funding that these companies provided to Al Qaeda was critical to its survival and continued existence. At a meeting, which included Bin Laden, the fluctuation of Sudanese currency caused great concern as most of Al Qaeda's income was derived from this business activity.

s. Al Qaeda's position regarding the United States was clear as early as in 1992 when Bin Laden issued a fatwa against the United States due to its presence in the Gulf region during the First Gulf War and its actions in Somalia.  The

discussion surrounding the fatwa included an explicit allowance for the murder of innocent civilians. Al Qaeda provided support to groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others.

t.  The partnership forged with the Sudanese government produced benefits for both parties. The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko, for use against the rebels in southern Sudan. Al-Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who explained the need for chemical weapons by the Sudanese government.

u.  Al Qaeda also provided communications equipment and Kalishnikov assault rifles for the Sudanese army, founded by the Islamic National Front, to fight the Christian rebels in the south. Al-Fadl, as part of this arrangement, also worked directly for the Sudanese government. For example, a Sudanese intelligence officer who also worked in the immigration office approached Al-Fadl and asked him to spy on a government opposition leader. Al-Fadl arrested the opposition leader and tried to turn him away from his work against the Sudanese government. The Sudanese intelligence officer advised Al-Fadl to lie to the opposition leader, to tell him that Al-Fadl had quit Al Qaeda and had stopped working with the government. Al-Fadl reported back to the head of the delegation office, the group of Sudanese intelligence officers that protected Al Qaeda; facilitated communications with the Sudanese government; and provided logistical support.

v.  Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in Sudan.

w.  Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in Sudan.

x.  Al Qaeda entered into a transaction to purchase uranium through the former President of the Republic of Sudan, currently an officer in the Sudanese army. The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with Al Qaeda in the manufacture of chemical weapons.  Al-Fadl discussed the uranium test with a member of the Sudanese government, whose brother was the overseer of the building where the chemical weapon manufacture was housed.

y.  Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment or office, Al Qaeda could not have carried out the United States embassy bombings that caused plaintiffs' injuries.  Such material support, assistance, and aid fits within the definition of material support as described by 18 U.S.C. § 2339A.

(105)  At the time that Plaintiffs filed their original suit against the Sudan in 2001, the Defendants BNPP, BNPP USA and BNPP Geneva hid and concealed their conspiracy with

Sudanese banks and other entities located in or controlled by Sudan to intentionally and willfully move large amounts of money through the U.S. financial system on behalf of Sanctioned Entities, including Al Qaeda and Hezbollah, in violation of U.S. sanctions laws.

(106)   Plaintiffs did not know, and could not possibly have known, of the conspiracy of the Defendants to move large amounts of money through the U.S. financially system on behalf of Sanctioned Entities, including Al Qaeda and Hezbollah, until the United States Department of Justice announced the guilty plea of BNPP Paribas to the conspiracy in a press release on or about June 30, 2014.

(107)   The funds received by Al Qaeda and Hezbollah from Sudanese Banks, as a result of the conspiracy of the Defendants to evade U.S. sanctions against Sudan, were necessary for the planning, preparation and carrying out of the Terrorist Bombings.

(108)   As set forth above, Al Qaeda and Hezbollah needed shelter, material support, and funds to prepare, plan and carry out the Terrorist Bombings. They received this assistance, inter *alia*, from the Sudan and the Defendants BNPP, BNPP USA and BNPP Geneva.

(109)   As of 1997, BNPP Geneva was the primary correspondent bank and in fact the *de facto* bank of Sudan.

(110)   The material support provided by Sudan to Al Qaeda and Hezbollah for the planning, preparation and ability to carry out the Terrorist Bombings, as set forth above, came from the millions of dollars obtained from the Sudanese national banks and financial institutions controlled by Sudan made possible by the conspiracy with BNPP, BNPP U.S.A and BNPP Geneva to evade U.S. Sanctions by moving money through the United States financial system as set forth above.

## VIOLATION OF U.S. CRIMINAL LAWS AND THE ANTI-TERRORISM ACT

(111)   The illegal banking activities of the Defendants BNPP, BNPP Geneva, and BNPP USA in conspiring with banks located in the Sudan to knowingly intentionally and willfully move large amounts of money throughout the U.S. financial system on behalf of Sanctioned Entities, including the Specially Designated Nationals Al Qaeda and Hezbollah, between 1997 up to and including August 7, 1998, which resulted in the Terrorist Bombings, violated multiple United States criminal laws.

(112)   The Defendants violated Executive Order 13067 and related regulations promulgated by OFAC pursuant to IEEPA which make it unlawful to export goods and services from the United States, including U.S. financial services to Sudan, without a license from OFAC. Under these Executive Orders and regulations, virtually all trade investment activities involving the U.S. financial system, including the processing of U.S. dollar transactions through the United States, were prohibited.

(113)   The Defendants clearly violated Executive Order 13067 and these regulations and BNPP entered a guilty plea to violating United States criminal laws as set forth above.

(114)   The Defendants' illegal banking actions between 1997 up and through August 7, 1998, which resulted in the Terrorist Bombings, violated Title 50, United States Code, Section 1705, which makes it a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of regulations issued pursuant to IEEPA, including the U.S. sanctions against Sudan.

(115)   BNPP pleaded guilty to violating Title 50, United States Code, Section 1705, as set forth above.

(116)   BNPP, BNPP USA, and BNP Geneva also violated Title 28 U.S.C. Sections 2339A, B, and C.

(117)   Title 28 U.S.C. Section 2339A prohibits the providing of "material support or resources," "knowing or intending that they are to be used in preparation for, or in carrying out," a violation of United States anti-terrorism laws.

(118)   Defendants provided material support and resources, including financial transactions and money, to Sudanese banks, who in turn transmitted the funds to Al Qaeda and Hezbollah to engage in acts of international terrorism including the Terrorist Bombings.

(119)   Title 28 U.S.C. Section 2339B(a)(1) makes it a crime to "provide[] material support or resources to a foreign terrorist organization" with "knowledge that the organization is a designated terrorist organization....that the organization has engaged or engages in terrorist activity.... or that the organization has engaged or engages in terrorism . . ." §2339B(a)(1)

(120)   The specific intent of the Defendants was to move money through United States Banks on behalf of Sudan and sanctioned, designated and known terrorist organizations, including Al Qaeda and Hezbollah.

(121)   Title 28 U.S.C. Section 2339C(a)(1) makes it a crime to directly or indirectly willfully provide or collect funds with the knowledge that such funds are to be used in full or in part to carry out any act intended to cause death or serious bodily injury to a civilian when the purpose of such act is to intimate a population or to compel a government or an international organization to do or to abstain from doing an act.

(122)   The intent of Sudan, Al Qaeda and Hezbollah, in carrying out the Terrorist Bombings, was to compel the United States to leave Africa and the Middle East.

(123)   Defendants committed a terrorist act on August 7, 1998 because the money they knowingly and intentionally transmitted to Sudan, Al Qaeda, and Hezbollah, was necessary for

the planning and preparation of the Terrorist Bombings, and necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings on August 7, 1998.

(124)   The actions of Defendants transcended national boundaries because they enabled sanctioned Sudanese national banks and financial entities controlled by Sudan, from at least 1997 through August 7, 1998, to receive U.S. dollars without being detected.   They allowed the originator of a transaction to send a wire transfer through a United States bank to the account of a "satellite" bank located in Africa, Europe or the Middle East, being held   at BNPP Geneva without reference to Sudan, and the satellite bank would then transfer the money to the Sudanese bank via internal transfer at BNPP Geneva.

(125)   The actions of Defendants to evade U.S. sanctions were dangerous to human life because Sudan is a sponsor of terrorism and Hezbollah and Al Qaeda are violent terrorist organizations, the primary goal of which is to engage in terrorist violence, including the murder of American citizens, and there actions resulted in the murder, maiming and injury of American citizens in the Terrorist Bombings.

(126)   Defendants BNPP, BNPP USA and BNPP Geneva provided Sudan, Al Qaeda and Hebollah with ongoing material support from at least 1997, continuing through August 7, 1998, by conspiring with Sudanese national banks and financial institutions controlled by Sudan to evade U.S. sanctions against Sudan, knowing that this would result in millions of dollars being transferred by these banks to Sudan and to terrorist groups, including Al Qaeda and Hezbollah, which were engaged in acts of international terrorism.

(127)   From at least 1997 through 2012, BNPP Geneva became the '*de facto*' bank of Sudan and engaged in elaborate schemes to evade U.S. sanctions by providing substantial banking

services to Sudanese banks and financial institutions controlled by Sudan including moving billions of dollars through the United States financial market.

(128)   These banking services enabled, facilitated, supported and assisted Al Qaeda and Hezbollah to carry out the Terrorist Bombings.

(129)   The Defendants knew that their actions would result in Al Qaeda and Hezbollah receiving millions of dollars in support, arms and supplies from Sudan as a result of their actions.

(130)   The actions of the Defendants BNPP, BNPP Paribas and BNPP Geneva constituted aiding and abetting Al Qaeda's and Hezbollah's "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333.

**COUNT I**
**CLAIM OF JAMES OWENS FOR PERSONAL INJURY**
**RESULTING FROM ASSAULT AND BATTERY**

(131)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(132)   On August 7, 1998, when the explosive device described above was detonated at Dar Es Salaam, James Owens suffered severe and permanent injuries, including a permanent loss of hearing, blast burns, severe lacerations which have resulted in scarring and permanent severe post-traumatic stress disorder.   The assailants intended the explosion to cause harmful contact with plaintiff and put him in reasonable apprehension of imminent battery.   These injuries were caused by Defendants and by a willful and deliberate act of persons who had been materially assisted by the Republic of Sudan and by the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings. The attacks were carried out for the purpose of

inflicting physical injuries and emotional distress upon this Plaintiff and others and by so doing to intimidate the United States and to cause its withdrawal from Muslim majority sections of the Middle East and Africa.

(133)  As a direct and proximate consequence of the foregoing acts, and the injuries thereby inflicted, Plaintiff, James Owens has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds, has occasioned a loss of wages, suffered humiliation and embarrassment and severe mental and emotional distress and has endured great pain and suffering, and has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014 in the amount of $11,309,250.00.

WHEREFORE, Plaintiff, James Owens, in accordance with the provisions of 18 U.S.C §2333(a) demands judgment jointly and severally, against the Defendants, BNPP, BNP Paribas USA, and BNP Geneva in an amount that is threefold the damages he sustained, in the amount of THIRTY THREE MILLION NINE HUNDRED AND TWENTY SEVEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS ($33,927,750.00), together with attorney fees and costs.

### COUNT II
### CLAIM OF GARY ROBERT OWENS,
### BETTY OWENS EVERLY AND BARBARA GOFF FOR
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(134)  Plaintiffs, Gary Robert Owens, Betty Owens Everly, and Barbara Goff repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(135)  As a direct and intended consequence of the intentional actions of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings, Plaintiffs, Gary Robert Owens,

Betty Everly and Barbara Goff, were caused severe mental distress, which has required continuing treatment, which will continue for the balance of the Plaintiffs' lives, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, as follows: (a) Gary Robert Owens – $2,827,312.50; (b) Betty Everly – $5,654,625.00; and (c) Barbara Goff – $2,827,312.50.

WHEREFORE, Plaintiffs, Gary Robert Owens, Betty Everly and Barbara Goff, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva, in the amount of threefold the damages each sustained, in the amount of EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50) for Gary Robert Owens, SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE DOLLARS($16,963,875.00) for Betty Everly and EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50) for Barbara Goff, together with attorney fees and costs.

**COUNT III**
**CLAIM OF FRANK B. PRESSLEY, Jr. FOR PERSONAL INJURY**
**RESULTING FROM ASSAULT AND BATTERY**

(136)   Plaintiff, Frank B. Pressley, Jr., a resident of the State of Texas, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(137)   On August 7, 1998, when the explosive device described above was detonated at Nairobi, Frank B. Pressley, Jr. suffered severe and permanent injuries, including but not limited to, destruction of his left shoulder joint, blast burns, severe laceration of his nose, loss of teeth, a fractured and crushed jaw, nerve damage in the hands, glass and other shrapnel wounds to the

head, fractures to the cervical spine, laceration and connective tissue damage to both knees, severe lacerations which have resulted in permanent scarring, and severe post-traumatic stress disorder. These injuries were caused by Defendants and by a willful and deliberate act of persons who had been materially assisted by the Islamic Republic of Iran and the Republic of Sudan and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings. The attacks were carried out for the purpose of inflicting physical injuries and emotional distress upon this Plaintiff and others and by so doing to intimidate the United States, and to cause its withdrawal from the Muslim majority sections of Middle East and Africa.

(138)   As a direct and proximate consequence of the intentional acts of the agents of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff, Frank B. Pressley, Jr., has been required to undergo extensive medical treatment, and other treatment, for which he has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation, suffered severe mental and emotional distress and embarrassment, and he has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014 in the amount of $27,785,984.92.

WHEREFORE, Plaintiff, Frank B. Pressley, Jr., in accordance with the provisions of 18 U.S.C §2333(a) demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva, in an amount that is threefold the damages he sustained, in the amount of EIGHTY THREE MILLION THREE HUNDRED AND FIFTY SEVEN THOUSAND NINE HUNDRED AND FIFTY FOUR DOLLARS AND SEVENTY SIX CENTS ($83,357,954.76), together with attorney fees and costs.

## COUNT IV
## CLAIM OF YASEMIN B. PRESSLEY FOR PERSONAL INJURY
## RESULTING FROM ASSAULT AND BATTERY

(139)  Plaintiff, Yasemin B. Pressley, a resident of the State of Texas, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(140)  On August 7, 1998, when the explosive device described above was detonated at Nairobi, Plaintiff, Yasemin B. Pressley, suffered severe and permanent injuries, including but not limited to, severe lacerations, glass and other shrapnel wounds and severe post-traumatic stress disorder.  The Defendants intended the explosion to cause harmful contact with plaintiff and put her in reasonable apprehension of imminent battery.  These injuries were caused by Defendants and by a willful and deliberate act of persons who had been materially assisted by the Republic of Sudan and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan, to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings of August 7, 1998. The attacks were carried out for the purpose of inflicting physical injuries and emotional distress upon this Plaintiff and others and by so doing to intimidate the United States, and to cause its withdrawal from Muslim majority sections of the Middle East and Africa.

(141)  As a direct and proximate consequence of the intentional acts of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff, Yasemin B. Pressley, has been required to undergo extensive medical treatment, nursing care, and other treatment, for which she has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment, severe mental and emotional distress and she has

thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the amount of $20,444,029.00.

WHEREFORE, Plaintiff, Yasmin B. Pressley, in accordance with the provisions of 18 U.S.C §2333(a) demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva, in an amount which is threefold the damages she sustained, in the amount of SIXTY ONE MILLION THREE HUNDRED THIRTY TWO THOUSAND AND EIGHTY SEVEN DOLLARS ($61,332,087.00), together with attorney fees and costs.

### COUNT V
### CLAIMS OF DAVID A. PRESSLEY, THOMAS C. PRESSLEY, MICHAEL F. PRESSLEY, BERK F. PRESSLEY, JON B. PRESSLEY, MARC Y. PRESSLEY, SUNDUS BUYUK,  FRANK PRESSLEY, Sr., BAHAR BUYUK, SERPIL BUYUK, TULAY BUYUK, AHMET BUYUK AND DOROTHY WILLARD FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(142)   Plaintiffs, David A. Pressley, Thomas C. Pressley, Michael F. Pressley, Berk F. Pressley, Jon B. Pressley, Marc Y. Pressley, Sundus Buyuk, Montine Bowen, Frank Pressley, Sr., Bahar Buyuk, Serpil Buyuk, Tolay Buyuk, Ahmet Buyuk, and Dorothy Willard repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(143)   As a direct and intended consequence of the intentional actions of Defendants, the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings, he Plaintiffs were caused severe mental distress, which has required continuing treatment, which will continue for the balance of the Plaintiffs' lives, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, as follows: (a) David A. Pressley – $5,654,625.00;

42

(b) Thomas Pressley – $5,654,625.00; (c) Michael Pressley – $5,654,625.00; (d) Berk F. Pressley – $11,309,250.00; (e) Jon B. Pressley – $11,309,250.00; (f) Marc Y. Pressley – $11,309,250.00; (g) Sundus Buyuk – $5,654,625.00; (h) Montine Bowen – $5,654,625.00; (i) Franklin Pressley, Sr. – $5,654,625.00; (j) Dorothy Willard – $2,827,312.50; (k) Ahmet Buyuk – $2,827,312.50; (l) Toylay Buyuk – $2,827,312.50; Serpil Buyuk – $2,827,312.50; and Bahar Buyuk – $2,827,312.50.

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva in an amount which is threefold the damages each sustained, in the amounts as follows: David A. Pressley, Thomas Pressley, Michael Pressley, Sundus Buyuk, Montine Bowen, and Franklin Pressley, Sr. each in the amount of SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE DOLLARS ($16,963,875.00); Berk F. Pressley, Jon B. Pressley, and Marc Y. Pressley, each in the amount of THIRTY THREE MILLION NINE HUNDRED AND TWENTY SEVEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS ($33,927,750.00); and Dorothy Willard, Ahmet Buyuk, Toylay Buyuk, Serpil Buyuk, and Bahar Buyuk, each in the amount of EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50), together with attorney fees and costs.

## COUNT VI
## CLAIM OF YASEMIN B. PRESSLEY FOR LOSS OF CONSORTIUM

(144)   Plaintiff, Yasemin B. Pressley, repeats and re-alleges each and every allegation set forth above with like effect as if alleged herein.

(145)   As a further and direct proximate result of the acts of Defendants, the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP U.S.A and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings, the Plaintiff, Yasemin Pressley, the wife of the Plaintiff, Frank B. Pressley, Jr., was caused to sustain a loss of services, comfort, society, and attentions in the past and future of the Plaintiff, Frank B. Pressley, Jr., and suffered a loss of consortium to the detriment of the marital relationship and has suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014 in the amount of $4,000,000.00.

WHEREFORE, Plaintiff, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva in an amount which is threefold the damages sustained  in the total amount of TWELVE MILLION DOLLARS, together with attorney fees and costs, which is included in the amount set forth in Count IV.

## COUNT VII
## CLAIM OF FRANK B. PRESSLEY, JR. FOR LOSS OF CONSORTIUM

(146)   Plaintiff, Frank B. Pressley, Jr., repeats and re-alleges each and every allegation set forth above with like effect as if alleged herein.

(147)   As a further and direct proximate result of the acts of Defendants, the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings, the Plaintiff, Frank B. Pressley, the husband

of the Plaintiff, Yasmin B. Pressley, Jr., was caused to sustain a loss of services, comfort, society, and attentions in the past and future of the Plaintiff, Yasmin B. Pressley, Jr., and suffered a loss of consortium to the detriment of the marital relationship and has suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014 in the amount of $3, 000, 000. 00.

WHEREFORE, Plaintiff, Frank B. Pressley, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants BNPP, BNPP USA, and BNPP Geneva, in the amount of threefold the damages he sustained, in the amount of threefold the damages he sustained, in the amount of NINE MILLION DOLLARS together with attorney fees and costs, which is included in the amount set forth in Count III.

## COUNT VIII
## CLAIM OF ELLEN KARAS FOR PERSONAL INJURY
## RESULTING FROM ASSAULT AND BATTERY

(148)   (144) Plaintiff, Ellen Karas, a resident of the State of Texas, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(149)   On August 7, 1998, when the explosive device described above was detonated at Nairobi, Plaintiff, Ellen Karas, suffered severe and permanent injuries, including but not limited to, extensive shrapnel penetration to both eyes resulting in permanent blindness, perforation of the left eye, detached retinas as to both eyes, shrapnel wounds to the head, arms, torso and legs, ruptured eardrums, numbness of the right hand, permanent partial loss of hearing, blast burns, severe lacerations of her entire body resulting in permanent scarring, has contracted acquired immunodeficiency syndrome as a result of rescue efforts/medical treatment and severe post-traumatic stress disorder.  The Defendants intended the explosion to cause harmful contact with plaintiff and put her in reasonable apprehension of imminent battery.  These injuries were caused by a willful and deliberate act of persons who had been materially assisted by terrorists for the

purpose of inflicting physical injuries and emotional distress upon this Plaintiff and others and by so doing to intimidate the United States, and to cause its withdrawal from Muslim majority sections of the Middle East and Africa. Those persons were at all times acting with the material support of the Republic of Sudan and the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, together with Sudanese national banks and financial institutions controlled by Sudan, to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings.

(150)   As a direct and proximate consequence of the intentional acts of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff, Ellen Karas, has been required to undergo extensive medical treatment, nursing care, and other treatment, for which she has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment, severe mental and emotional distress and she has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the amount of $36,359,146.00.

WHEREFORE, Plaintiff, Ellen Karas, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants BNPP, BNPP USA, and BNPP Geneva, in an amount which is threefold the damages she sustained, in the amount of ONE HUNDRED AND NINE MILLION SEVENTY SEVEN THOUSAND FOUR HUNDRED AND THIRTY EIGHT DOLLARS ($109,077,438.00), together with attorney fees and costs

## COUNT IX
### CLAIM OF DONALD G. BOMER, MICHAEL JAMES CORMIER, GEORGE KARAS, NICHOLAS KARAS AND PATRICIA FEORE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(151)   Plaintiffs, Donald G. Bomer, Michael James Cormier, George Karas, Nicholas Karas and Patricia Feore repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(152)   As a direct and intended consequence of the intentional actions of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings,  the Plaintiffs, Donald G. Bomer, Michael James Cormier, George Karas, Nicholas Karas, and Patricia Feore,  were caused severe mental distress, which has required continuing treatment, which will continue for the balance of the Plaintiffs' lives, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, as follows: As a direct and intended consequence of the intentional and reckless actions of the Defendants, which were extreme and outrageous, conduct that is intolerable in a civilized society, the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired together with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings, caused severe mental distress which will continue for the balance of each Plaintiff's life, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, as follows: (a) Donald G. Bomer – $9,047,400.00; (b) Michael James Cormier – $5,654,625.00; (c) George Karas – $2,827,312.50, (d) Nicholas Karas – $2,827,312.50, and (e) Patricia Feore – $5,654,625.00;

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva in an amount which is threefold the damages each sustained, in the amounts as follows: (a) Donald G. Bomer TWENTY SEVEN MILLION ONE HUNDRED AND FORTY TWO THOUSAND TWO HUNDRED DOLLARS ($27,142,200.00); (b) Michael James Cormier SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE DOLLARS ($16,963,875.00);  (c) George Karas EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50);  (d) Nicholas Karas EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50), and (e) Patricia Feore SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE  DOLLARS ($16,963,875.00), together with attorney fees and costs.

## COUNT X
## CLAIM OF DONALD G. BOMER FOR LOSS OF CONSORTIUM

(153)   Plaintiff, Donald G. Bomer, repeats and re-alleges each and every allegation set forth above with like effect as if alleged herein.

(154)   As a further and direct proximate result of the acts of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings were aided and abetted by the Defendants, the Plaintiff, Donald G. Bomer, the husband of the Plaintiff, Ellen Karas , sustained a loss of services,

comfort, society, and attentions in the past and future of the Plaintiff, Ellen Karas, and suffered a loss of consortium to the detriment of the marital relationship and has suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014 in the amount of $4,000, 000. 00.

WHEREFORE, Plaintiff, Donald G. Bomer, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, in an amount which is threefold the total damages he sustained  in the amount of TWELVE MILLION DOLLARS, together with attorney fees and costs, which is already included in the amount set forth in Count IX.

**COUNT XI**
**CLAIM OF THE ESTATE OF CLYDE M. HIRN**
**BY HIS PERSONAL REPRESENTATIVE**
**ALICE M. HIRN FOR PERSONAL INJURY**
**RESULTING FROM ASSAULT AND BATTERY**

(155)  Plaintiff, the Estate of Clyde M. Hirn, by his Personal Representative, Alice M. Hirn, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(156)  On August 7, 1998, when the explosive device described above was detonated at Nairobi, Clyde M. Hirn, suffered severe and permanent injuries, including but not limited to, extensive injury to the brain including concussion, nerve damage to his legs and feet, a fractured shoulder, blast burns, severe lacerations of his entire body resulting in permanent scarring, a shoulder fracture, loss of memory and mental ability and severe post-traumatic stress disorder. The terrorists who carried out the attack intended to cause injury to Clyde M. Hirn and the other plaintiffs and put him in reasonable apprehension of imminent battery.  These injuries were caused by a willful and deliberate act of Defendants and of those terrorists who had been materially assisted by the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese

national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings. The attack was intended to inflict physical injuries, mental and emotional distress upon this Plaintiff and others and by so doing to intimidate the United States, and to cause its withdrawal from the Near East and Africa.

(157)   As a direct and proximate consequence of the intentional acts of the terrorists who had been materially assisted by the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings, and the injuries thereby inflicted, Clyde M. Hirn has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he was required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment and severe mental and emotional distress, prior to his death on August 1, 2012, and he has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the amount of $15,877,231.00,

WHEREFORE, Plaintiff, the Estate of Clyde M. Hirn, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva, in an amount which is threefold the damages he sustained in the amount of FORTY SEVEN MILLION SIX HUNDRED AND THIRTY ONE THOUSAND SIX HUNDRED AND NINETY THREE DOLLARS ($47,631,693.00) together with attorney fees and costs.

## COUNT XII
## CLAIM OF PATRICIA K. FAST, PAUL HIRN, ELOISE HUBBLE, MARGARET BAKER AND THE ESTATE OF INEZ P. HIRN FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(158)  Plaintiffs, Patricia K. Fast, Paul Hirn, Eloise Hubble, Margaret Baker and the Estate of Inez P. Hirn, repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(159)  As a direct and intended consequence of the intentional and reckless actions of the Defendants and the terrorists, which constituted extreme and outrageous conduct, that is intolerable in a civilized society, assisted by the material support of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide Al Qaeda and Hezbollah with the money, supplies and material support necessary to carry out the Terrorist Bombings,  the Plaintiffs whose names are set forth in the preceding paragraph were caused, as a natural and continuous sequence of the actions of the Defendants, to suffer severe mental and emotional distress which will continue for the balance of each Plaintiffs' life, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the following amounts: (a) Patricia K. Fast – $5,654,625.00; (b) Paul Hirn – $2,827,312.50; (c) Eloise Hubble – $2,827,312.50; (d) Margaret Baker – $2,827,312.50; and (e) Inez P. Hirn – $5,654,625.00.

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva,, in an amount which is threefold the damages each sustained, in the amounts as follows: (a) Patricia K. Fast SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE DOLLARS ($16,963,875.00); (b)

Paul Hirn EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE

HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50) ; (c)

Eloise Hubble EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE

HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); (d)

Margaret Baker – EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND

NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50));

and (e) The Estate of Inez P. Hirn, SIXTEEN MILLION NINE HUNDRED AND SIXTY

THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE DOLLARS

($16,963,875.00); together with attorney fees and costs.

### COUNT XIII
### CLAIM OF JOYCE REED FOR PERSONAL INJURY
### RESULTING FROM ASSAULT AND BATTERY

(160)   Plaintiff Joyce Reed repeats and re-alleges each and every allegation set forth

above with equal effect as if alleged herein.

(161)   On August 7, 1998, when the explosive device described above was detonated at

Nairobi, Plaintiff Joyce Reed suffered severe and permanent injuries, including lacerations to her

entire body and severe posttraumatic stress disorder intended to cause harmful contact with

plaintiff and put her in reasonable apprehension of imminent battery.   The persons who carried

out these actions had been materially assisted by the Republic of Sudan, the Ministry of the

Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva,

who conspired with Sudanese national banks and financial institutions controlled by Sudan to

provide money, supplies and material support necessary for Al Qaeda and Hezbollah to carry out

the Terrorist Bombings.

(162)   As a direct and proximate consequence of the intentional acts of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff Joyce Reed has been required to undergo extensive medical treatment, nursing care, and other treatment, for which she has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment, which caused severe mental and emotional distress which will continue for the balance of Plaintiff's life and she has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, of in the amount of $14,560,491.00.

WHEREFORE, Plaintiff, Joyce Ann Reed, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva, in an amount which is threefold the damages she sustained, in the amount of FORTY THREE MILLION SIX HUNDRED EIGHTY ONE THOUSAND FOUR HUNDRED SEVENTY THREE DOLLARS   ($43,681,473.00), together with attorney fees and costs.

## COUNT XIV
### CLAIM OF WORLEY LEE REED FOR PERSONAL INJURY RESULTING FROM ASSAULT AND BATTERY

(163)   Plaintiff Worley Lee Reed, a resident of the State of Florida at the time of the occurrence alleged, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(164)   On August 7, 1998, when the explosive device described above was detonated at Nairobi, Plaintiff, Worley Lee Reed, suffered severe and permanent injuries, including injury to both lungs, rotator cuff injury to both shoulders with severe loss of movement and strength, spinal injuries and severe post-traumatic stress disorder.  The explosion was intended to cause harmful contact with plaintiff and put him in reasonable apprehension of imminent battery.  The persons

who carried out these actions had been materially assisted by the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings.

(165)   As a direct and proximate consequence of the intentional acts of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff Worley Lee Reed has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment, which caused severe mental and emotional distress which will continue for the balance of Plaintiff's life and he has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, of in the amount of $15,781,747.36.

WHEREFORE, Plaintiff, Worley Lee Reed, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva in an amount which is threefold the damages she sustained, in the amount of FORTY SEVEN MILLION THREE HUNDRED AND FORTY FIVE THOUSAND TWO HUNDRED AND FORTY TWO DOLLARS  ($47,345,242.08), together with attorney fees and costs.

## COUNT XV
### CLAIM OF CHERYL L. BLOOD, BRET W. REED, LINDA JANE WHITESIDE O'DONNELL, PERSONAL REPRESENTATIVE OF THE ESTATE OF RUTH ANN WHITESIDE, FLOSSIE VARNEY AND LINDA JANE WHITESIDE O'DONNELL INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(166)  Plaintiffs, Cheryl L. Blood, Bret W. Reed, the Estate of Ruth Ann Whiteside, Flossie Varney, and Linda Jane Whiteside O'Donnell, repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(167)  As a direct and intended consequence of the intentional and reckless actions of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP US and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide money, supplies and material support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings, the Plaintiffs whose names are set forth in the preceding paragraph were caused severe mental distress which will continue for the balance of each Plaintiff's life, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the following amounts: (a) Cheryl L. Blood – $11,309,250.00; (b) Bret W. Reed  – $11,309,250.00; (c) Ruth Ann Whiteside – $5,654,625.00; (d) Flossie Varney – $5,654,625.00; and (e) Linda Jane Whiteside O'Donnell – $2,827,312.50.

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva, in an amount which is threefold the damages each sustained, in the amounts as follows: (a) Cheryl L. Blood, THIRTY THREE MILLION NINE HUNDRED AND TWENTY SEVEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS ($33,927,750.00); (b) Bret W. Reed, THIRTY THREE MILLION NINE HUNDRED AND TWENTY SEVEN THOUSAND SEVEN HUNDRED AND FIFTY DOLLARS ($33,927,750.00); (c) Ruth Ann Whiteside, SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT HUNDRED AND SEVENTY FIVE DOLLARS ($16,963,875.00)); (d) Flossie Varney - SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND EIGHT

HUNDRED AND SEVENTY FIVE DOLLARS ($16,963,875.00);; and (e) Linda Jane

Whiteside O'Donnell – EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE

THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS

($8,481,937.50), together with attorney fees and costs.

**COUNT XVI**
**CLAIM OF LYDIA HICKEY FOR PERSONAL INJURY**
**RESULTING FROM ASSAULT AND BATTERY**

(168)  Plaintiff Lydia Hickey repeats and re-alleges each and every allegation set forth

above with equal effect as if alleged herein.

(169)  On August 7, 1998, when the explosive device described above was detonated at

Nairobi, Plaintiff Lydia Hickey suffered severe and permanent injuries, including lacerations to

her body, shrapnel and glass wounds, injury to facial nerves and severe post-traumatic stress

disorder.  The explosion was intended to cause harmful contact with plaintiff and put her in

reasonable apprehension of imminent battery.   These injuries were caused by extreme,

outrageous, willful and deliberate act of persons who had been materially assisted by Defendants

for the purpose of inflicting physical injuries and emotional and mental distress upon this Plaintiff

and others and by so doing to intimidate the United States, and to cause its withdrawal from

Muslim majority sections of Muslim majority sections of the Middle East and Africa. Those

persons were at all times acting with the material support of the Republic of Sudan, the Ministry

of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP

Geneva, who conspired with Sudanese national banks and financial institutions controlled by

Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah to

carry out the Terrorist Bombings.

(170)   As a direct and proximate consequence of the intentional acts of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff, Lydia Hickey, has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment, and she has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014  in the amount of $22,021,698.00.

WHEREFORE, Plaintiff Lydia Hickey in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva, in the amount of threefold the damages each sustained, in the amount of SIXTY SIX MILLION SIXTY FIVE THOUSAND NINETY FOUR DOLLARS ($66,065,094.00), together with attorney fees and costs.

**COUNT XVII**
**CLAIM OF HOWARD SPARKS, TABITHA CARTER, HOWARD SPARKS, Jr.,**
**MICHAEL SPARKS, LORETTA PAXTON, LORA MURPHY,**
**LINDA SHOUGH, LAURA HARRIS, LYDIA HICKEY – PERSONAL**
**REPRESENTATIVE OF THE ESTATE OF LEROY MOOREFIELD, ELLEN B.**
**MOOREFIELD – PERSONAL REPRESENTATIVE OF THE ESTATE OF ROGER**
**MOOREFIELD and JUDY L. MOOREFIELD – PERSONAL REPRESENTATIVE OF**
**THE ESTATE OF RODNEY MOOREFIELD**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(171)   Plaintiffs, Howard Sparks, Tabitha Carter, Howard Sparks, Jr., Michael Sparks, Michael Sparks, Loretta Paxton, Lora Murphy, Linda Shough, Laura Harris, Estate of Leroy Moorefield, Estate of Roger Moorefield, and the Estate of Roger Moorefield repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(172)   As a direct and intended consequence of the intentional and reckless actions of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants

BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings, the Plaintiffs whose names are set forth in the preceding paragraph, were caused severe mental and emotional distress which will continue for the balance of each Plaintiff's life, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the following amounts: (a) Howard Sparks – $19,560,362.00; (b) Tabitha Carter – $14,136,562.50; (c) Howard Sparks, Jr – $15,860,624.00; (d) Michael Sparks – $14,136,562.50; (e) Loretta Paxton  – $2,827,312.50; (f) Lora Murphy - $2,827,312.50 (g) Linda Shough – $2,827,312.50; (h) Laura Harris – $2,827,312.50; (i) Estate of Leroy Moorefield – $5,654,625.00; (j) Estate of Roger Moorefield – $2,827,312.50; and (k) Estate of Rodney Moorefield – $2,827,312.50.

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva, in an amount that is threefold the damages each sustained, in the amounts as follows: (a)Howard Sparks – FIFTY EIGHT MILLION SIX HUNDRED AND EIGHTY ONE THOUSAND AND EIGHTY SIX DOLLARS ($58,681,086.00); (b) Tabitha Carter – FORTY TWO MILLION FOUR HUNDRED AND NINE THOUSAND SIX HUNDRED AND EIGHTY SEVEN DOLLARS AND FIFTY CENTS ($42,409,687.50); (c) Howard Sparks, Jr. – FORTY SEVEN MILLION FIVE HUNDRED AND EIGHTY ONE THOUSAND EIGHT HUNDRED AND SEVENTY TWO DOLLARS ($47,581,872.00); (d) Michael Sparks - FORTY TWO MILLION FOUR HUNDRED AND NINE THOUSAND SIX HUNDRED AND EIGHTY SEVEN DOLLARS AND FIFTY CENTS ($42,409,687.50)(e) Loretta Paxton – EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND

THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); (f) Lora Murphy - EIGHT

MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED AND

THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); (g) Linda Shough –

EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED

AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); (h) Laura Harris -

EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE HUNDRED

AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); (i) Estate of Leroy

Moorefield – SIXTEEN MILLION NINE HUNDRED AND SIXTY THREE THOUSAND

EIGHT HUNDRED AND SEVENTY FIVE DOLLARS ($16,963,875.00); (j) Estate of Roger

Moorefield – EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE THOUSAND NINE

HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); and (k)

Estate of Rodney Moorefield – EIGHT MILLION FOUR HUNDRED AND EIGHTY ONE

THOUSAND NINE HUNDRED AND THIRTY SEVEN DOLLARS AND FIFTY CENTS

($8,481,937.50); together with attorney fees and costs.

### COUNT XVIII
### CLAIM OF HOWARD SPARKS
### FOR LOSS OF CONSORTIUM

(173)   Plaintiff, Howard Sparks, repeats and re-alleges each and every allegation set forth

above with like effect as if alleged herein.

(174)   As a further and direct proximate result of the acts of the Republic of Sudan, the

Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and

BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled

by Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah

to carry out the Terrorist Bombings, plaintiff, Howard Sparks, the husband of the Plaintiff, Lydia

Hickey, was caused to sustain a loss of services, love and affection of the Plaintiff, Lydia Hickey, and suffered a loss of consortium to the detriment of the marital relationship, was caused severe mental distress which will continue for the balance of the Plaintiff's life and he has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014  in the amount of $5,500,000.00.

WHEREFORE, Plaintiff, Howard Sparks, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Paribas, in an amount that is threefold the damages he sustained, in the total amount of  SIXTEEN MILLION, FIVE HUNDRED THOUSAND DOLLARS, together with attorney fees and costs, which is included in the total in Count XVII.

### COUNT XIX
### CLAIM OF GARY O. SPIERS FOR PERSONAL INJURY RESULTING FROM ASSAULT AND BATTERY

(175)  Plaintiff, Gary O. Spiers, repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(176)  On August 7, 1998, when the explosive device described above was detonated at Nairobi, Plaintiff Gary O. Spiers suffered severe and permanent injuries, including a fractured right arm, dislocated right shoulder, shrapnel injuries to the groin and abdomen, punctured eardrums, lacerations to his body, loss of balance, erectile dysfunction, ringing in the ears and severe post-traumatic stress disorder.  The explosion was intended to cause harmful contact with plaintiff and put him in reasonable apprehension of imminent battery.  These injuries were caused by a willful and deliberate act of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide money,

supplies and material support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings.

(177)   As a direct and proximate consequence of the intentional acts as above set forth Plaintiff, Gary O. Spiers, has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, humiliation and embarrassment, and severe mental and emotional distress which will continue for the balance of the Plaintiff's life and he has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014  in the amount of $15,678,925.00.

WHEREFORE, Plaintiff, Gary O. Spiers, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNP Paribas S.A. and BNP Paribas USA, in an amount that is threefold the damages he sustained, in the amount of FORTY SEVEN MILLION THIRTY SIX THOUSAND SEVEN HUNDRED AND SEVENTY FIVE DOLLARS ($47,036,775.00), together with attorney fees and costs.

## COUNT XX
### CLAIMS OF VICTORIA J. SPIERS, THE ESTATE OF JULITA A. QUALICIO, THE ESTATE OF EULOGIO QUILACIO, RICHARD DAVID PATRICK, ROLANDO QUILACIO, SUSZN QUILACION NICHOLS, CANDELARIA QUILACO NICHOLAS, EDILBERTO QUILACIO,  RICHARD DAVID PATRICK AND VICTORIA Q. SPIERS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(178)   Plaintiffs, Victoria J. Spiers, the Estate of Julita A. Qualicio, the Estate of Eulogio Qualicio, Richard David Patrick, Rolando Quilacio, Suszn Quilacio, Candelaria Quilacio Nicholas, Edilberto Quiacio, and Victoria Q. Spiers repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(179)   As a direct and intended consequence of the intentional and reckless actions of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings, the Plaintiffs whose names are set forth in the preceding paragraph, were caused severe mental distress which will continue for the balance of each Plaintiff's life, and each has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014, in the following amounts: (a) Victoria J. Spiers $9,047,400.00; (b)The Estate Of Julita A. Quilacio $3,392,775.00; (c) The Estate of Eulogio Quilacio $3,392,775.00; (d) Richard David Patrick $5,654,625.00; (e) Rolando Quilacio $2,827,312.50; (f) Suszn Quilacio $2,827,312.50; (g) Candelaria Quilacio Nicholas $2,827,312.50; (h) Edilberto Quilacio, $2,827,312.50; (j) Victoria Q. Spiers, $12, 900, 890.00.

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva, in an amount that threefold the damages each sustained, in the amounts as follows: (a) Victoria J. Spiers TWENTY SEVEN MILLION ONE HUNDRED FORTY TWO THOUSAND TWO HUNDRED DOLLARS ($27,142,200.00); (b) The Estate Of Julita A. Quilacio TEN MILLION ONE HUNDRED SEVENTY EIGHT THOUSAND THREE HUNDRED TWENTY FIVE DOLLARS ($10,178,325.00); (c) The Estate of Eulogio Quilacio TEN MILLION ONE HUNDRED SEVENTY EIGHT THOUSAND THREE HUNDRED TWENTY FIVE DOLLARS ($10,178,325.00); (d) Richard David Patrick SIXTEEN MILLION NINE HUNDRED SIXTY THREE THOUSAND EIGHT HUNDRED SEVENTY FIVE DOLLARS ($16,963,875.00); (d) Rolando Quilacio EIGHT MILLION FOUR HUNDRED EIGHTY ONE

THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY

CENTS($8,481,937.50); (e) Suszn Quilacio Nicholas EIGHT MILLION FOUR HUNDRED

EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY

CENTS($8,481,937.50); (f) Candelaria Quilacio Nicholas EIGHT MILLION FOUR HUNDRED

EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY

CENTS ($8,481,937.50); and (g) Edilberto Quilacio, EIGHT MILLION FOUR HUNDRED

EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY

CENTS ($8,481,937.50), and (h) Victoria Q. Spiers THIRTY EIGHT MILLION, SEVEN

HUNDRED AND TWO THOUSAND SIX HUNDRED AND SEVENTY DOLLARS.

## COUNT XXI
## CLAIM OF VICTORIA Q. SPIERS FOR LOSS OF CONSORTIUM

(180)   Plaintiff Victoria Q. Spiers repeats and re-alleges each and every allegation set

forth above with like effect as if alleged herein.

(181)   As a further and direct proximate result of the acts of the Republic of Sudan, the

Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and

BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled

by Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah

to carry out the Terrorist Bombings, the Plaintiff, Victoria Q. Spiers, the wife of the Plaintiff Gary

O. Spiers was caused to sustain a loss of services, love and affection of the Plaintiff, Gary O. Spiers,

and suffered a loss of consortium to the detriment of the marital relationship which will continue for

the balance of her life and has thereby suffered damages as found by this Court in Civil Action 01-

2244, on March 28, 2014 in the amount of $4,000,000.00.

WHEREFORE, Plaintiff, Victoria Q. Spiers, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA, and BNPP Geneva in an amount that is threefold the damages she sustained, in the total amount of TWELVE MILLION DOLLARS, an amount already included in the total in Count XX..

**COUNT XXII**
**CLAIM OF RIZWAN KHALIQ FOR PERSONAL INJURY**
**RESULTING FROM ASSAULT AND BATTERY**

(182)  Plaintiff repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(183)  On August 7, 1998, when the explosive device described above was detonated at Nairobi, Kenya, Plaintiff, Rizwan Khaliq, suffered severe and permanent injuries, including but not limited to a permanent loss of hearing, blast burns, severe lacerations which have resulted in scarring and permanent, and severe post-traumatic stress disorder.  He also suffered injuries including but not limited to: force and trauma to the body so severe as to cause internal bleeding; a severed ear; shrapnel wounds; and blackened gums. His injuries were so severe as to cause hospitalization for more than one week. He continues to have glass coming out of his face even today. He suffered seeing colleagues dead all around him, and himself woke up after the blast in a pool of blood. The explosion was intended to cause harmful contact with plaintiff and put him in reasonable apprehension of imminent battery.  These injuries were caused by Defendants and by a willful and deliberate act of persons who had been materially assisted by the Republic of Sudan and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial institutions controlled by Sudan to provide money, supplies, and material

support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings. The attacks were carried out for the purpose of inflicting physical injuries and emotional distress upon this Plaintiff and others and by so doing to intimidate the United States, and to cause its withdrawal from Muslim majority sections of the Middle East and Africa.

(184)   As a direct and proximate consequence of the foregoing acts as above set forth and the injuries thereby inflicted, Plaintiff, Rizwan Khaliq, has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds, has occasioned a loss wages and has endured great pain and suffering, humiliation and embarrassment and severe mental and emotional distress. Plaintiff continues to suffer from severe post-traumatic stress disorder. As a result of all of the above Plaintiff Rizwan Khaliq  has thereby suffered damages as found by this Court in Civil Action 10-356, on March 28, 2014 in the amount of $14,702,869.86.

WHEREFORE, Plaintiff, Rizwan Khaliq, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNP Paribas USA, and BNPP Geneva in an amount that is threefold the damages he sustained, in the amount of FORTY FOUR MILLION ONE HUNDRED EIGHT THOUSAND SIX HUNDRED AND NINE DOLLARS AND FIFTY EIGHT CENTS ($44,108,609.58), together with attorney fees and costs.

## COUNT XXIII
## CLAIM OF JENNY CHRISTIANA LOVBLOM
## FOR LOSS OF CONSORTIUM

(185)   Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(186)   As a further and direct proximate result of the acts of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, the Defendants, BNPP, BNPP USA and BNPP Geneva, Plaintiff, Jenny Christina Lovblom, the wife of the Plaintiff, Rizwan Khaliq, was caused to sustain a loss of services, love and affection of the Plaintiff, Rizwan Khaliq, and suffered a loss of consortium to the detriment of the marital relationship, was caused severe mental distress and post-traumatic stress disorder which will continue for the balance of the Plaintiff's life and she has thereby suffered damages as found by this Court in Civil Action 01-2244, on March 28, 2014  in the amount of $4, 000,000.00.

WHEREFORE, Plaintiff, Jenny Christina Lovblom, in accordance with the provisions of 18 U.S.C §2333(a), demands judgment jointly and severally, against the Defendants, BNPP, BNPP USA and BNPP Geneva, in an amount that is threefold the total damages she sustained, in the amount of TWELVE MILLION DOLLARS together with attorney fees and costs, an amount already included in the total included in Count XXIV.


### COUNT XXIV
### CLAIMS OF JENNY CHRISTIANA LOVBLOM,
### IMTIAZ BEDUM, YASIR AZIZ, IMRAN KHALIQ,
### KAMRAN KHALIK, NAURIN KHALIQ, NAURIN
### KHALIQ, IRFAN KHALIQ, & TEHSIN KHALIQ
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(187)   Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(188)   As a direct and proximate result of the willful, wrongful and intentional acts of the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, and the Defendants BNPP, BNPP USA and BNPP Geneva, who conspired with Sudanese national banks and financial

institutions controlled by Sudan to provide money, supplies, and material support necessary for Al Qaeda and Hezbollah to carry out the Terrorist Bombings, Plaintiffs (a) Jenny Christina Lovblom, the wife of Plaintiff Rizwan Khaliq, (b) Imtiaz Bedum, the mother of Plaintiff Rizwan Khaliq, (c) Yasir Aziz, the brother of Plaintiff Rizwan Khaliq, (d) Imran Khaliq, the brother of Plaintiff Rizwan Khaliq, (e) Kamran Khaliq, the father of Plaintiff Rizwan Khaliq, (f) Naurin Khaliq, the sister of Plaintiff Rizwan Khaliq, (g) Irfan Khaliq, the brother of Plaintiff Rizwan Khaliq, and (h) Tehsin Khaliq, the sister of Plaintiff Rizwan Khaliq, were caused severe mental distress and post traumatic stress disorder which will continue for the balance of each Plaintiff's life, and each has thereby suffered damages as found by this Court in Civil Action 10-356, on March 28, 2014, in the following amounts: (a) Jenny Christina Lovblom, $12,440,175.00; (b) Imtiaz Bedum, $5,654,625.00; (c) Yasir Aziz, $2,827,312.50; (d) Imran Khaliq, $2,827,312.50 (e)Kamran Khaliq, $2,827,312.50; (f) Naurin Khaliq, $2,827,312.50; (g) Irfan Khaliq, and (h) Tehsin Khaliq, $2,827,312.50.

WHEREFORE, Plaintiffs, in accordance with the provisions of 18 U.S.C §2333(a), demand judgment jointly and severally, against the Defendants, BNP Paribas S.A. and BNP Paribas USA, in an amount that is threefold the damages each sustained, in the amounts as follows: (a) Jenny Christina Lovblom, THIRTY SEVEN MILLION THREE HUNDRED AND TWENTY THOUSAND FIVE HUNDRED AND TWENTY FIVE DOLLARS ($37,320,525.00); (b) Imtiaz Bedum, SIXTEEN MILLION NINE HUNDRED SIXTY THREE THOUSAND EIGHT HUNDRED SEVENTY FIVE DOLLARS ($16,963,875.00); (c) Yasir Aziz, EIGHT MILLION FOUR HUNDRED EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY CENTS ($8,481,937.50); (d) Imran Khaliq, EIGHT MILLION FOUR HUNDRED EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS

AND FIFTY CENTS ($8,481,937.50); (e) Kamran Khaliq, EIGHT MILLION FOUR

HUNDRED EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS

AND FIFTY CENTS($8,481,937.50); (f) Naurin Khaliq, EIGHT MILLION FOUR HUNDRED

EIGHTY ONE THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY

CENTS ($8,481,937.50); (g) Irfan Khaliq, EIGHT MILLION FOUR HUNDRED EIGHTY ONE

THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY CENTS

($8,481,937.50);   and (h) Tehsin Khaliq, EIGHT MILLION FOUR HUNDRED EIGHTY ONE

THOUSAND NINE HUNDRED THIRTY SEVEN DOLLARS AND FIFTY CENTS

($8,481,937.50).


Dated:  November 27, 2015                Respectfully submitted,

                                         FAY LAW GROUP, P.A.

                                         By: 
                                         Thomas Fortune Fay, Esq.
                                         (DC Bar No.  23929)
                                         777 6th Street, NW, Suite 410
                                         Washington, DC  20001
                                         Tel.:  202/589-1300
                                         Fax: 202/589-1721
                                         Email:  ThomasFay@aol.com



                                         BOND & NORMAN LAW, PC

                                         By: 
                                         Jane Carol Norman, Esq.
                                         (DC Bar No.:  384030)
                                         777 6th Street, NW, Suite 410
                                         Washington, DC  20001
                                         Tel: 202/682-4100
                                         Fax: 202/207/1041
                                         Email:  janenorman@bondandnorman.com

## DEMAND FOR JURY TRIAL

All Plaintiffs hereby make a demand for jury trial.

Thomas Fortune Fay, Esq.

Jane Carol Norman, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of November, 2015, a copy of the foregoing was served on all parties of record via ECF.

_____
Thomas Fortune Fay