**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES OWENS, *et al.*,

                         Plaintiffs,

        -against-

BNP PARIBAS S.A., *et al.*,

                     Defendants.

Civil No. 1:15-Civ-1945-JDB

Hon. John D. Bates

## <u>NOTICE OF DEFENDANTS' MOTION TO DISMISS</u>

Defendants BNP Paribas S.A., BNP North America, Inc. and BNP Paribas (Suisse) S.A. ("the Defendants"), by and through their undersigned counsel, respectfully move for dismissal of the Amended Complaint, dated November 27, 2015, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. In support of this motion, the Defendants submit the accompanying Memorandum of Law of Defendants BNP Paribas S.A., BNP North America, Inc. and BNP Paribas (Suisse) S.A. in Support of Their Motion to Dismiss the Amended Complaint, dated January 29, 2016, and the Declaration of Alexis Collins, dated January 29, 2016, and the accompanying exhibits.

Dated: January 29, 2016
   Washington, D.C.

       Respectfully Submitted,

       CLEARY GOTTLIEB STEEN &
       HAMILTON LLP

       /s/ Alexis Collins
       Alexis Collins (D.C. Bar # 474599)
       2000 Pennsylvania Avenue, N.W.
       Washington, D.C.  20006-1801
       Telephone:  (202) 974-1519
       Facsimile:  (202) 974-1999
       Email: alcollins@cgsh.com
       *Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES OWENS, *et al.*,

                       Plaintiffs,

          -against-

BNP PARIBAS S.A., *et al.*,

                       Defendants.

Civil No. 1:15-Civ-1945-JDB

Hon. John D. Bates

**MEMORANDUM OF LAW OF DEFENDANTS BNP PARIBAS S.A.,
BNP NORTH AMERICA, INC. AND BNP PARIBAS (SUISSE) S.A.
IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-1801
(202) 974-1500

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendants BNP Paribas S.A., BNP North America, Inc. and BNP Paribas (Suisse) S.A.

January 29, 2016

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

    I.     STATUTORY BACKGROUND ....................................................................2

    II.    THE ALLEGATIONS OF THE COMPLAINT...........................................3

LEGAL STANDARDS ...............................................................................................7

ARGUMENT ..............................................................................................................9

    I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATA .............9

          A.     The Complaint's Claims Are Time-Barred ................................................9

          B.     The Complaint Fails Plausibly To Allege That BNPP's Actions
                 Proximately Caused The Attacks ............................................................11

                 1.     The Complaint Must Plausibly Plead That BNPP's Actions
                         Proximately Caused The Attacks...............................................11

                 2.     The Provision Of Financial Services To A State Sponsor Of
                         Terrorism Cannot Support Liability Without A Plausible
                         Allegation That Funds Provided To The State Sponsor Actually
                         Were Transferred To Terrorists And Aided In Perpetrating The
                         Terrorist Act ................................................................................12

                 3.     The Complaint Fails To Satisfy Section 2333's Proximate
                           Causation Requirement ..............................................................18

           C.     Section 2333 Does Not Permit Secondary Liability Claims....................22

           D.     The Complaint Cannot Assert A Claim Under Section 2339C Of
                   The ATA Because That Provision Was Enacted After The Attacks.........26

    II.    THE COMPLAINT DOES NOT ALLEGE ANY WRONGDOING BY
           BNPP NORTH AMERICA .................................................................................27

CONCLUSION.........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abecassis v. Wyatt*,
    7 F. Supp. 3d 668 (S.D. Tex. 2014)..................................................... 23

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ..................................................... 26

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ....................................................... 8

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ............................................................... passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................... passim

*Atherton v. D.C. Office of Mayor*,
    567 F.3d 672 (D.C. Cir. 2009) ............................................................ 7

*Bakeir v. Capital City Mortg. Corp.*,
    926 F. Supp. 2d 320 (D.D.C. 2013)..................................................... 10

*BCCI Holdings (Luxembourg), S.A. v. Khalil*,
    214 F.3d 168 (D.C. Cir. 2000) ........................................................... 11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................... 7

*Blackwell v. SecTek, Inc.*,
    61 F. Supp. 3d 149 (D.D.C. 2014) ....................................................... 8

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008)...................................................... passim

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
    291 F.3d 1000 (7th Cir. 2002)............................................................ 23

*Bond v. U.S. Dep't of Justice*,
    828 F. Supp. 2d 60 (D.D.C. 2011) ..................................................... 27

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ...........................................12, 17, 23

*Burrage v. United States*,
    134 S. Ct. 881 (2014).............................................................................. 11

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
    511 U.S. 164 (1994) .......................................................................... passim

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
    135 F.3d 837 (2d Cir. 1998)................................................................... 24

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d (E.D.N.Y. 2012)........................................................... 25

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................... 26

*Hemi Grp. v. City of New York*,
    559 U.S. 1 (2010) ..................................................................................... 3

*Holmes v. Secs. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) .......................................................................... passim

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig., v. Chiquita Brands Int'l, Inc.*,
    2015 WL 71562 (S.D. Fla. Jan. 6, 2015).............................................. 23

*In re Interbank Funding Corp. Sec. Litig.*,
    629 F.3d 213 (D.C. Cir. 2010) ................................................................. 7

*Lexmark Int'l. Inc. v. Control Components Inc.*,
    134 S. Ct. 1377 (2014)........................................................................... 18

*Linde v. Arab Bank, PLC*,
    944 F. Supp. 2d 215 (E.D.N.Y. 2013).................................................... 23

*M.J. ex rel Jarvis v. Georgetown Univ. Med. Ctr.*,
    962 F. Supp. 2d 3 (D.D.C. 2013) .......................................................... 10

*Morton v. D.C. Housing Auth.*,
    720 F. Supp. 2d 1 (D.D.C. 2010) .......................................................... 27

*Norman v. United States*,
    467 F.3d 773 (D.C. Cir. 2006) .............................................................. 10

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
    714 F.3d (2d Cir. 2013) ...................................................................... passim

*Pace v. DiGuglielmo*,
    544 U.S. 408 (2005) ................................................................................. 9

*Phillips v. Heine,*
        984 F.2d 489 (D.C. Cir. 1993) ............................................................. 10

*Ratzlaf v. United States,*
        510 U.S. 135 (1994) ............................................................................. 11

*Rothstein v. UBS AG,*
        708 F.3d 82 (2d Cir. 2013).................................................................. passim

*Siegel v. SEC,*
        592 F.3d 147 (D.C. Cir. 2010) ............................................................. 11

*Sievarding v. U.S. Dep't of Justice,*
        693 F. Supp. 2d 93 (D.D.C. 2010) ....................................................... 8, 21, 26

*Smith-Haynie v. District of Columbia,*
        155. F.3d 575, 579-80 (D.C. Cir. 1998) ............................................. 9

*Toumazou v. Turkish Republic of N. Cyprus,*
        71 F. Supp. 3d 7 (D.D.C. 2014) .......................................................... 27

*Ungar v. Islamic Republic of Iran,*
        211 F. Supp. 2d 91 (D.D.C. 2002) ...................................................... 26

*W. Wood Preservers Inst. v. McHugh,*
        292 F.R.D. 145 (D.D.C. 2013)............................................................. 4

*Walsh v. Ford Motor Co.,*
        588 F. Supp. 1513 (D.D.C. 1984) ....................................................... 9

*Wultz v. Bank of China Ltd.,*
        942 F. Supp. 2d 452 (S.D.N.Y. 2013) ................................................ 23

*Wultz v. Islamic Republic of Iran,*
        755 F. Supp. 2d 1 (D.D.C. 2010) ........................................................ 16, 24

**Federal Statutes**

18 U.S.C. § 1964(c) ........................................................................................ 13

18 U.S.C. § 2332g(c)(1) ................................................................................. 25

18 U.S.C. § 2333............................................................................................. passim

18 U.S.C. § 2333(a) ........................................................................................ passim

18 U.S.C. § 2335 ............................................................................................ 9

18 U.S.C. § 2339A .......................................................................................... 2, 7, 27

18 U.S.C. § 2339B ............................................................................................ 2, 7

18 U.S.C. § 2339C ............................................................................................ passim

18 U.S.C. § 2339D ............................................................................................ 25

Suppression of the Financing of Terrorism Convention Implementation Act of 2001, Public Law
      107-197, 116 Stat. 721 (June 25, 2002) ................................................................ 26

**Other Authorities**

Ben Protess & Jessica Silver-Greenberg, *BNP Paribas Admits Guilt and Agrees to Pay $8.9
      Billion Fine to U.S.*, N.Y. TIMES, June 30, 2014, *available at*
      http://dealbook.nytimes.com/2014/06/30/bnp-paribas-pleads-guilty-in-sanctions-case  10

Danielle Douglas, *France's BNP Paribas to Pay $8.9 Billion to U.S. for Sanctions Violations*,
      WASH. POST, June 30, 2014, *available at*
      https://www.washingtonpost.com/business/economy/frances-bnp-paribas-to-pay-89-
      billion-to-us-for-money-laundering/2014/06/30/6d99d174-fc76-11e3-b1f4-
      8e77c632c07b_story.html. ................................................................................ 10

Devlin Barrett, Christopher M. Matthews & Andrew R. Johnson, *BNP Paribas Draws Record
      Fine for 'Tour de Fraud'*, WALL ST. J., June 30, 2014, *available at*
      http://www.wsj.com/articles/bnp-to-pay-at-least-2-billion-to-ny-regulator-in-sanctions-
      settlement-1404141181 ...................................................................................... 10

Defendants BNP Paribas S.A. ("BNPP Paris"), BNP North America, Inc. ("BNPP North America") and BNP Paribas (Suisse) S.A. ("BNPP Geneva") (collectively, "BNPP") respectfully move, under Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

The August 7, 1998 attacks on the U.S. embassies in Kenya and Tanzania (the "Attacks") were abhorrent. But BNPP is not responsible for the Attacks. It did not commit any acts of terrorism and it did not support any terrorists.

What matters for purposes of this motion is that the Complaint does not contain any plausible allegations that BNPP is responsible for the Attacks. Instead, it attempts to stretch the civil provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, beyond the statute's bounds in an effort to collect (treble) damages from BNPP for injuries that the Complaint fails to adequately plead were proximately caused by BNPP's actions. In particular, the Complaint makes broad allegations of a purported conspiracy among BNPP, Sudan and Sudanese banks to process U.S. dollar-denominated transactions for Sudan, and then leaps from that contention to alleging that BNPP knowingly provided material support for the Attacks. But the Complaint contains no non-conclusory assertion as to how BNPP's actions proximately caused the Attacks, as the ATA unquestionably requires.

As shown below, several courts have dismissed civil ATA claims against international banks that relied on precisely the same type of allegations found in the Complaint. This Court should do the same. The Complaint's allegations fail as a matter of law for several reasons. First, as a threshold matter, the claims alleged are time-barred. The Attacks occurred more than 17 years ago, well outside the ATA's ten year statute of limitations, and the Complaint does not

properly plead any grounds for tolling the limitations period.  Second, the Complaint fails to plausibly allege that BNPP proximately caused Plaintiffs' injuries, as the ATA requires.  In prior ATA cases based on allegations of an indirect causal connection between a bank's transactions and a terrorist act that are similar to the causal allegations here, courts have uniformly dismissed complaints for failure to state a claim as a matter of law, and the same result should follow here. Third, the Complaint should be dismissed on the independent basis that the conspiracy and aiding and abetting theories of secondary liability on which the Complaint relies are not cognizable under the ATA.  Fourth, the Complaint fails to state an ATA claim under Section 2339C because that statute was enacted after the Attacks occurred and does not apply retroactively.  Fifth, the Complaint contains no non-conclusory factual allegations of wrongdoing by BNPP North America.

The Court should therefore dismiss the Complaint in its entirety.

## BACKGROUND

## I.    STATUTORY BACKGROUND

The ATA is largely comprised of criminal prohibitions relating to terrorism, but Section 2333(a) of the ATA, which the Complaint invokes, creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism."  As relevant here, Section 2333(a) requires that the Complaint properly plead several indispensable elements.

First, each Plaintiff must be a U.S. citizen.

Second, Plaintiffs must plausibly allege that BNPP provided material support and resources either to designated foreign terrorist organizations, or while knowing that such support and resources would be used in preparation for, or to carry out, terrorist acts in violation of U.S. criminal law, 18 U.S.C. § 2339A-B, or that BNPP provided or collected funds with the intention

or knowledge that such funds would be used for such terrorist acts, 18 U.S.C. § 2339C; *see also* 18 U.S.C. §§ 2333(a); Compl. ¶¶ 44-46, 116-130.

Third—and critically for purposes of this motion, because the Complaint does not satisfy this element at all—the Complaint must plausibly allege that Plaintiffs were injured "by reason of" BNPP's actions. This element requires plausible, non-conclusory allegations that BNPP's actions proximately caused the Attacks. *See* 18 U.S.C. § 2333(a); *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013); *accord O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d, 118, 123-24 (2d Cir. 2013). As the Supreme Court has confirmed, proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[T]he central question [with respect to proximate cause] . . . is whether the alleged violation led directly to the plaintiff's injuries."). As shown below, the Complaint's failure to make plausible factual allegations that satisfy this indispensable proximate causation element requires its dismissal.

## II.    THE ALLEGATIONS OF THE COMPLAINT

The Complaint is premised on an alleged conspiracy among BNPP, Sudan and Sudanese banks and other financial institutions located in countries not subject to U.S. sanctions. Specifically, it contends that:

> Defendants . . . conspired with each other and with Sudanese national banks, and other financial institutions and entities controlled by Sudan, all of which were subject to U.S. sanctions, and other financial institutions located in countries not subject to U.S. sanctions, knowingly, intentionally, and willfully to move billions of dollars through the U.S. financial system on behalf of Sanctioned Entities, Specially Designated Nationals (SDNs), and

known international terrorist groups including Al Qaeda and
Hezbollah, in violation of U.S. sanctions.

Compl. ¶ 7.

The allegations in the Complaint concerning BNPP's conduct are based almost

exclusively on BNPP's June 2014 guilty plea and related civil settlements with federal and state

banking regulators addressing violations of U.S. sanctions that prohibit certain financial

transactions with designated countries and SDNs (collectively, the "June 2014 Agreements").

*See id.* ¶¶ 73-99.[1]  Based on the detailed factual statements that are part of the June 2014

Agreements, the Complaint alleges that BNPP conspired with Sudanese banks to "concea[l] U.S.

dollar transactions using the U.S. financial system on behalf of banks and other entities located

in or controlled by Sudan" in violation of U.S. sanctions against Sudan.  *Id.* ¶ 77.

In fact, as the June 2014 Agreements explicitly state, BNPP Paris pled guilty to engaging

in transactions that violated the sanctions against Sudan between 2002—four years <u>after</u> the

Attacks, which occurred on August 7, 1998—and 2007.  *See* SOF ¶ 17.  Thus, the June 2014

Agreements do not support the Complaint's conclusory allegations that BNPP proximately

caused the Attacks, which occurred four years earlier.

The Complaint also contains allegations about BNPP's conduct during the limited time

period between the imposition of U.S. sanctions on Sudan in November 1997 and the date of the

---

[1] These documents, all effective June 30, 2014, are attached to the Declaration of Alexis Collins, dated
January 29, 2016 ("Collins Decl."): (Ex. A) Department of Justice and District Attorney for the County of
New York Plea Agreement Statement of Facts ("SOF"); (Ex. B) New York State Department of Financial
Services Consent Order ("DFS Consent Order"); (Ex. C) Office of Foreign Assets Control Settlement
Agreement; and (Ex. D) the Federal Reserve System Cease and Desist Order.  The Court may properly
consider the contents of the June 2014 Agreements because the Complaint relies upon them in support of
its primary substantive allegations regarding BNPP's conduct, and quotes from and discusses them
extensively.  *See, e.g.*, Compl. ¶¶ 73-99; s*ee also W. Wood Preservers Inst. v. McHugh*, 292 F.R.D. 145,
149 (D.D.C. 2013) ("[I]t is well established that in ruling on a motion to dismiss, '[t]he Court may
consider . . . documents upon which the plaintiff's complaint necessarily relies. . . .'" (citations omitted)).

Attacks, August 7, 1998, the <u>only</u> time during which Plaintiffs could even theoretically allege that BNPP engaged in transactions that proximately caused the Attacks. But Plaintiffs have not done so; their allegations regarding that period are entirely conclusory, and rely solely on admissions in the June 2014 Agreements regarding the initial establishment of certain banking relationships between BNPP Geneva and Sudanese banks, and not any specifically pled transactions. *See, e.g.*, Compl. ¶¶ 81-90; SOF ¶¶ 19 (BNPP Geneva became sole correspondent bank in Europe for Sudanese Government Bank 1) (quoted in Compl. ¶ 82), 23 (BNPP Geneva "began its relationship with many" of the "satellite banks" to "help disguise" transactions with Sudanese banks); DFS Consent Order ¶¶ 16 (same as SOF ¶ 23), 26 (same as SOF ¶ 19). <u>Critically, none of these conclusory allegations identifies a basis for the Complaint's essential assertion that BNPP engaged in transactions with Sudan or Sudanese banks during this period that funded the Attacks</u>. Nothing in any of the June 2014 Agreements or any of the related documents that itemize the facts underlying BNPP's sanctions violations connects BNPP to <u>any</u> terrorist, <u>any</u> terrorist organization or <u>any</u> terrorist activity, or alleges that BNPP provided <u>any</u> support to or funds for <u>any</u> terrorist organization or terrorist activity, let alone for the Attacks.

The Complaint alleges that the Sudanese government sponsored terrorist groups and that Sudan was named a State Sponsor of Terrorism by the U.S. Department of State in 1993, and it quotes extensively from 1997 Congressional testimony about Sudan's role as a sponsor of terrorism. Compl. ¶¶ 47-60, 104. However, the Complaint contains no non-conclusory allegations as to how the Sudanese government purportedly financed terrorist groups—through banks or otherwise. Instead, the Complaint includes one conclusory assertion that a witness testified at a Congressional subcommittee hearing "as to the nexus between any outside financial transactions with Sudan and terrorist acts." *Id.* ¶ 56. The Complaint's only specific allegations

regarding Sudan's support to terrorists rest on the facts found by this Court in *Owens v. Republic of Sudan*, Civ. No. 01-2244 (JBD) and 10-356 (JDB), which largely concern the provision of safe harbor and other forms of military and logistical aid. *See, e.g., id.* ¶ 104 (alleging that, among other things, Sudan invited al Qaeda to move to Sudan, provided security for al Qaeda, facilitated the movement of weapons, and protected al Qaeda members from interference by immigration officials). By contrast, the Complaint alleges that income "critical to [al Qaeda's] survival and continued existence" came from its own business ventures. *Id.* ¶ 104 r.

Critically, the Complaint does not identify a single banking transaction processed by BNPP that allegedly was part of Sudan's transfer of funds to any terrorist organization at any time, let alone before the Attacks. Nor does the Complaint allege that Sudan's purported "economic aid" to al Qaeda was provided in U.S. dollars. *See id.* ¶¶ 104 v., w. And the Complaint lacks any well-pled allegation that, in processing U.S. dollar-denominated transactions for Sudanese banks, BNPP made any transfer for any segment of the Sudanese government that allegedly funded al Qaeda or Hezbollah, much less that BNPP processed transactions directly for al Qaeda, Hezbollah or any other terrorist entity.

At bottom, the Complaint lacks any well-pled allegations sufficient to support the conclusion that BNPP's processing of U.S. dollar-denominated transactions for sanctioned Sudanese banks proximately caused the Attacks, which is an indispensable element of Plaintiffs' claims under the ATA. Instead, the Complaint contains only several conclusory allegations that BNPP aided and abetted Sudan in helping al Qaeda and Hezbollah to commit the Attacks, *id.* ¶¶ 2-3, namely that the Attacks were "planned, prepared and carried out with the financial resources knowingly and intentionally provided . . . to Sudan, Al Qaeda, and Hezbollah by" BNPP, *id.* ¶ 6; the Attacks would not have occurred if U.S. sanctions had "been universally

enforced against Sudanese national banks and financial institutions controlled by Sudan in the time period of 1997-1998," *id.* ¶ 12; BNPP's actions "enabled Sudan, Al Qaeda, and Hezbollah to obtain millions of dollars for and from Sudanese national banks[ . . ., which] was necessary for" carrying out the Attacks, *id.* ¶ 16; and BNPP's acts "resulted in the murder, maiming and injury of American citizens," *id.* ¶ 18.  None of these allegations states <u>any</u> facts that connect <u>any</u> of BNPP's U.S. dollar-clearing transactions to the Attacks, or indeed, to <u>any</u> terrorist organizations in Sudan or elsewhere.

Despite failing to make the non-conclusory factual allegations that are essential to asserting a claim under the ATA, the Complaint nonetheless posits that BNPP participated in a conspiracy that violated Sections 2339A, 2339B and 2339C of the ATA, thus entitling Plaintiffs to damages under Section 2333.  *Id.* ¶¶ 116-130.  The Complaint purports to seek damages under the labels of various common law torts (*e.g.*, assault and battery, intentional infliction of emotion distress) and remedies (*e.g.*, loss of consortium), but all grounded on its claim of ATA liability. *See id.* ¶¶ 131-188.  There are no well-pled facts that give rise to a legally cognizable claim under any of these theories.

## LEGAL STANDARDS

To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010).  *Iqbal*'s plausibility standard requires more than a "sheer possibility" that a defendant is liable, 556 U.S. at 678, and a complaint that "pleads facts that are merely consistent with a defendant's liability" falls short of showing plausible entitlement to relief, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  Instead, to survive a dismissal

motion, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In applying *Iqbal*, this Court employs a "'two-pronged approach,' under which [it] first identifies the factual allegations that are entitled to an assumption of truth and then determines 'whether they plausibly give rise to an entitlement to relief.'" *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 14 (D.D.C. 2010) (Bates, J.) (quoting *Iqbal*, 556 U.S. at 679). Under the first prong, "labels and conclusions," "formulaic recitation of the elements of a cause of action," "legal conclusion[s] couched as . . . factual allegation[s]" and "naked assertions devoid of further factual enhancement" all must be disregarded. *Sievarding v. U.S. Dep't of Justice*, 693 F. Supp. 2d 93, 99-100 (D.D.C. 2010) (Bates, J.) (internal quotations omitted). Under the second prong, assessing the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 155 (D.D.C. 2014) (Bates, J.) (quoting *Iqbal*, 556 U.S. at 679), and courts "need not accept inferences drawn by plaintiffs" if they are unsupported by the facts in the complaint, *Sievarding*, 693 F. Supp. 2d at 100 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Applying these standards to the Complaint requires its dismissal.

## ARGUMENT

### I.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE ATA

The Complaint fails to state a claim under the ATA, and thus should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), because its claims:  (1) are outside the ATA's ten year statute of limitations, 18 U.S.C. § 2335; (2) contain no well-pled allegations that BNPP proximately caused Plaintiffs' injuries; and (3) are premised on theories of secondary liability that are not cognizable under the ATA.

#### A.    The Complaint's Claims Are Time-Barred

The Complaint was filed on November 3, 2015, more than 17 years after the Attacks.  Its claims, therefore, fall well outside of the ATA's ten year limitations period under 18 U.S.C. § 2335.

The Complaint suggests that Plaintiffs may seek to salvage their claims by invoking the equitable tolling doctrine, Compl. ¶¶ 105-106, but the Complaint lacks the allegations needed to do so.  The "hurdle [to establish equitable tolling] is high" and courts will only exercise this power in "extraordinary and carefully circumscribed instances." *Smith-Haynie v. District of Columbia*, 155. F.3d 575, 579-80 (D.C. Cir. 1998).  A plaintiff seeking the extraordinary remedy of equitable tolling "bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).  Further, a plaintiff must plead these elements "with sufficient particularity" to "demonstrate that there was, in fact, due diligence exercised by the plaintiffs." *Walsh v. Ford Motor Co.*, 588 F. Supp. 1513, 1523 (D.D.C. 1984).

The Complaint's assertions that BNPP "hid and concealed their conspiracy" and that Plaintiffs "did not know, and could not possibly have known, of the conspiracy," Compl. ¶¶ 105-106, are insufficient as a matter of law to satisfy Plaintiffs' burden of demonstrating that the

extraordinary remedy of equitable tolling should be applied here.  *See, e.g.*, *Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006) (no tolling where plaintiff failed to identify "any efforts . . . much less reasonably diligent effort" to pursue his claim).  Equitable tolling requires, and the Complaint fails to allege, diligence prior to the expiration of the statute of limitations. *M.J. ex rel Jarvis v. Georgetown Univ. Med. Ctr.*, 962 F. Supp. 2d 3, 10 (D.D.C. 2013) (no tolling where plaintiff failed to identify "any efforts prior to the expiration of the . . . . statute of limitations").

At a minimum, Plaintiffs knew or should have known all of the facts they allege concerning the purported conspiracy on which they ground their claims when the June 2014 Agreements were widely published on June 30, 2014.  The agreements received extensive national and international press attention on that same day.[2]  This lawsuit, however, was not filed until <u>more than 16 months later</u>, on November 3, 2015.  The Complaint does not allege any reason, let alone a plausible particularized reason, for that protracted delay.  *See Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993) ("[T]olling does not bring about an automatic extension of the statute of limitations by the length of the tolling period.  It gives the plaintiff extra time only if he needs it."); *Bakeir v. Capital City Mortg. Corp.*, 926 F. Supp. 2d 320, 335 (D.D.C. 2013) (once on notice, plaintiff must "move promptly and with reasonable diligence").

---

[2] *See, e.g.*, Ben Protess & Jessica Silver-Greenberg, *BNP Paribas Admits Guilt and Agrees to Pay $8.9 Billion Fine to U.S.*, N.Y. TIMES, June 30, 2014, at B1, *available at* http://dealbook.nytimes.com/2014/06/30/bnp-paribas-pleads-guilty-in-sanctions-case/; Devlin Barrett, Christopher M. Matthews & Andrew R. Johnson, *BNP Paribas Draws Record Fine for 'Tour de Fraud'*, WALL ST. J., June 30, 2014, *available at* http://www.wsj.com/articles/bnp-to-pay-at-least-2-billion-to-ny-regulator-in-sanctions-settlement-1404141181; Danielle Douglas, *France's BNP Paribas to Pay $8.9 Billion to U.S. for Sanctions Violations*, WASH. POST, June 30, 2014, *available at* https://www.washingtonpost.com/business/economy/frances-bnp-paribas-to-pay-89-billion-to-us-for-money-laundering/2014/06/30/6d99d174-fc76-11e3-b1f4-8e77c632c07b_story.html.

Thus, the Complaint has not demonstrated the exercise of due diligence that equitable tolling requires.

      **B.**     **The Complaint Fails Plausibly To Allege That BNPP's Actions Proximately Caused The Attacks**

              **1.**     **The Complaint Must Plausibly Plead That BNPP's Actions Proximately Caused The Attacks**

Section 2333(a) requires that the Complaint plausibly allege that Plaintiffs' injuries occurred "by reason of" BNPP's purported material support to al Qaeda and Hezbollah.  The phrase "by reason of," requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well."  *BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168, 173 (D.C. Cir. 2000) (quoting *Holmes*, 503 U.S. at 258); *see also Burrage v. United States*, 134 S. Ct. 881, 889 (2014) ("[T]he phrase, 'by reason of,' requires at least a showing of 'but for' causation." (internal quotations and citation omitted)); *Rothstein*, 708 F.3d at 95 (applying *Holmes*'s construction of "by reason of" to Section 2333); *see also Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (It is a fundamental rule of statutory construction that "a *single* formulation" of words applied across multiple federal statutes—here, the phrase "by reason of" used in Section 2333, the federal RICO statute and the federal antitrust laws—must be construed "the same way each time it is called into play.").

Thus, the Complaint must properly plead that BNPP's actions "led directly to the [Plaintiffs'] injuries."  *See Anza*, 547 U.S. at 461 ("[T]he central question [with respect to proximate cause] . . . is whether the alleged violation led directly to the plaintiff's injuries."); *Siegel v. SEC*, 592 F.3d 147, 159 (D.C. Cir. 2010) ("[P]roximate causation . . . is normally understood to require a direct relation between conduct alleged and injury asserted.") (internal quotations omitted) (citing *Holmes*, 503 U.S. at 258); *Rothstein*, 708 F.3d at 91 ("Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been

injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence." (citation omitted)); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F. 3d 685, 698 (7th Cir. 2008) (en banc) ("*Boim III*") (defendants' direct provision of funds to Hamas satisfied proximate cause because it "significantly enhanced the risk of terrorist acts [committed by Hamas] and thus the probability that the plaintiff's decedent would be a victim"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (defining proximate cause as "a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances" (quoting *Murphy v. United States*, 653 F.2d 637, 648 n.48 (D.C. Cir. 1981)).  As shown below, the Complaint fails to meet this requirement.

> **2.    The Provision Of Financial Services To A State Sponsor Of Terrorism Cannot Support Liability Without A Plausible Allegation That Funds Provided To The State Sponsor Actually Were Transferred To Terrorists And Aided In Perpetrating The Terrorist Act**

At most, the Complaint alleges only that BNPP provided <u>indirect</u> support to al Qaeda and Hezbollah by providing financial services to a state sponsor of terrorism, Sudan, and to Sudanese banks, which in turn allegedly provided direct support to al Qaeda and Hezbollah.[3]  Under the *Anza* standard, as well as under Second Circuit rulings that specifically address similar allegations of <u>indirect</u> support for terrorist acts under the ATA, the Complaint's allegations are therefore insufficient to establish the necessary proximate causal link between BNPP's actions

---

[3] *See, e.g.*, Compl. ¶¶ 107 ("The funds received by Al Qaeda and Hezbollah from Sudanese Banks, as a result of the conspiracy of the Defendants to evade U.S. sanctions against Sudan, were necessary for the planning, preparation and carrying out of the Terrorist Bombings."), 110, 118 ("*Defendants provided material support* and resources, including financial transactions and money, *to Sudanese banks, who in turn transmitted the funds to* Al Qaeda and Hezbollah to engage in acts of international terrorism including the Terrorist Bombings.") (emphasis added).

and the Attacks under Section 2333.  Pursuant to these precedents, the Complaint can satisfy the

ATA's proximate causation requirement only by making plausible allegations that funds

provided by BNPP <u>actually were transferred</u> to the perpetrators of the Attacks, or that those

funds were otherwise a "but for" cause of the Attacks.  As shown below, because the Complaint

contains no such well-pled allegations, it should be dismissed.

It is a fundamental principle of statutory construction that, when Congress borrows

language from previous statutes, it is presumed to "know[] the interpretation federal courts had

given the words earlier Congresses had used."  *Holmes*, 503 U.S. at 268.  Thus, as the Court

ruled  in *Holmes*—and later reaffirmed in *Anza*, 547 U.S. at 457—Congress's use of the phrase

"by reason of" to describe the causation element of RICO's private right of action, 18 U.S.C.

§ 1964(c), "carried the intention to adopt 'the judicial gloss that avoided a simple literal

interpretation.'"  503 U.S. at 268 (quoting *Associated Gen. Contractors of Cal.*, *Inc. v.

Carpenters*, 459 U.S. 519, 532-33 (1983)).  Rather, as the Court held, the phrase "by reason of"

imports a proximate causation requirement as understood in federal common law, which

demands "some direct relation between the injury asserted and the injurious conduct alleged."

*Id.*; *see Anza*, 547 U.S. at 461.  The principles underlying this ruling are (1) "the less direct an

injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages

attributable to the violation, as distinct from other, independent, factors," and (2) "quite apart

from problems of proving factual causation, recognizing claims of the indirectly injured would

force courts to adopt complicated rules apportioning damages among plaintiffs removed at

different levels of injury from the violative acts, to obviate the risk of multiple recoveries."

*Holmes*, 503 U.S. at 269 (citing *Associated General Contractors*, 459 U.S. at 542-43, 543-44).

Accordingly, Section 2333 requires that the Complaint allege causation consistent with the standard articulated in *Holmes* and *Anza*.

In *Rothstein*, the Second Circuit applied the reasoning of *Holmes* and *Anza* and rejected ATA claims based on precisely the same theory of <u>indirect</u> causation as the one on which the Complaint relies here, 708 F.3d at 97, and this Court should do the same. Federal courts in the District of Columbia have not yet considered an ATA claim alleging the kind of indirect causation alleged here, and thus *Rothstein*'s analysis is instructive.

*Rothstein* involved ATA claims against UBS by victims of Hamas and Hezbollah bombings and rocket attacks, who alleged that UBS "facilitated" those attacks by directly "furnishing United States currency to Iran" in violation of U.S. sanctions. *Id.* at 84-87, 93. Similarly to the Complaint here, the *Rothstein* complaint alleged that U.S. sanctions on Iran "made it difficult for Iran to obtain the large sums of cash dollars needed for the Hezbollah and Hamas operations," and that UBS "solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash," *id.* at 87, "kn[owing] full well that the cash dollars it was providing . . . would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas [and] Hezbollah," *id.* at 97. The *Rothstein* complaint further alleged that "the ability of Hezbollah and Hamas to . . . carry out those attacks was substantially increased by those organizations' receipt of cash dollars from Iran." *Id.* at 87.

The Second Circuit affirmed the dismissal of the complaint on the ground that it failed to plausibly allege that UBS's actions were the proximate cause of plaintiffs' injuries. *Id.* at 95. In words that apply equally here, the court squarely rejected the argument that a bank's violation of U.S. sanctions laws by engaging in financial transactions with a state sponsor of terrorism is a sufficient basis to hold a bank "liable for injuries subsequently caused by a terrorist organization

14

associated with that state." *Id.* at 96.  The court noted that the plaintiffs' "contention that proximate cause is established because they were injured after [UBS] violated federal law is a *post hoc, ergo propter hoc* proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly liable [under the ATA]." *Id.*  As the Second Circuit concluded, "[i]f Congress had intended to impose strict liability" on the basis of violations of U.S. law, including sanctions regulations issued by the Office of Foreign Assets Control, "it would have found words more susceptible to that interpretation, rather than repeating the language it had used in other statutes to require a showing of proximate cause." *Id.*

Thus, despite the *Rothstein* complaint's assertion that Hamas and Hezbollah needed U.S. currency to fund their operations, that UBS had illegally provided Iran with hundreds of millions of dollars of such currency, and in so doing UBS knew that this currency would be used to fund terrorist attacks, *id.* at 85-87, 97—allegations that are substantively identical to the allegations here concerning BNPP's processing of U.S. dollar-denominated transactions for Sudan—the Second Circuit found that the plaintiffs had failed to satisfy Section 2333's proximate cause requirement for several reasons, including that:

- **UBS did not participate in the attacks:**  "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." *Id.*

- **UBS did not provide banknotes directly to terrorists:**  "[The Complaint] does not allege that UBS provided money to Hezbollah or Hamas.  It does not allege that U.S. currency UBS transferred to Iran was given to Hezbollah or Hamas." *Id.*

- **UBS's alleged acts were not necessary to Iran's terrorism funding:**  "[The Complaint] does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.*

- **Iran has legitimate uses for financial services:**  "[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

15

The Second Circuit concluded that, while "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism," these allegations were insufficient to "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by Hezbollah and Hamas that injured plaintiffs." *Id.*

The Second Circuit's subsequent decision in *Al Rajhi*, 714 F.3d at 118, dismissing claims by victims of the September 11, 2001 attacks, reaffirmed the inadequacy as a matter of law of proximate cause allegations—such as those made here—that do not assert a direct connection between the defendant and the terrorist act that allegedly caused the plaintiff's injury. In the respects pertinent here, *Al Rajhi* rejected, for failing to properly plead proximate causation, claims that several Saudi banks were liable for the September 11 attacks because they allegedly provided "financial support" and "'financial [and bank account] services'" to purported charities that in turn allegedly supported al Qaeda. *Id.* at 123 (brackets in original) (citations omitted). Echoing *Rothstein*, *Al Rahji* held that the complaint had not adequately pled that the banks proximately caused the September 11 attacks because it did "not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." *Id.* at 124.

*Rothstein*'s and *Al Rajhi*'s distinction between permissible civil ATA claims based on direct causation and impermissible claims based on indirect causation is underscored by ATA rulings in this District. *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 22 (D.D.C. 2010),

concerned allegations that defendant Bank of China ("BOC") transferred funds directly from Palestinian Islamic Jihad ("PIJ") operatives to an account BOC maintained for a PIJ agent. Accordingly, the Court held that the complaint adequately pled proximate causation because BOC "allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence against Jewish civilians in Israel." *Id.* at 53. The Court distinguished the facts in *Wultz* from those in *Rothstein* by observing that the *Wultz* complaint "alleged a flow of money *directly* into the coffers of the PIJ—an organization entirely devoted to terrorist activity, and thus one that is unlikely to use wired moneys for any other purpose." *Id.* at 22 (citations omitted).

The critical distinction between direct and indirect causation for purposes of pleading proximate cause under the ATA is illustrated even more clearly in *Burnett*, 274 F. Supp. 2d at 86. On the one hand, the Court found that the complaint stated a claim against Al–Haramain Islamic Foundation ("AHIF"), a charity alleged to have maintained a direct relationship with al Qaeda. *Id.* at 104-07. Because of this direct relationship, the Court stated that "[a]ny terrorist act, including the September 11 attacks, might have been the natural and probable consequence of [defendant's] knowingly and intentionally providing financial support to al Qaeda." *Id.* at 105. By contrast, the Court rejected as insufficiently pleading proximate causation the complaint's allegations that Al Rajhi Bank was the "primary bank for a number of charities" that purportedly supported terrorist organizations. *Id.* at 109.[4]

---

[4] The Court permitted Al Rajhi Bank to serve plaintiffs with a Rule 12(e) request for a more definite statement and reserve its right to renewing its dismissal motion after receiving plaintiffs' response. 274 F. Supp. 2d at 110. The case was later transferred to the Southern District of New York and consolidated into *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2870 (2014), in which, as described above, the Second Circuit affirmed the district court's dismissal of the claims against the bank.

These precedents therefore demonstrate that, in an <u>indirect</u> causation case such as this one, a plaintiff cannot satisfy the ATA's proximate causation requirement were he or she fails to plausibly allege that funds provided by the defendant <u>actually were transferred</u> to the perpetrator of the attack, or that those funds were otherwise a "but for" cause of that attack.

### 3.    The Complaint Fails To Satisfy Section 2333's Proximate Causation Requirement

Applying the proximate causation precedents described above to the Complaint here requires the Complaint's dismissal. *See Lexmark Int'l. Inc. v. Control Components Inc.*, 134 S. Ct. 1377, 1398 n.6 (2014) (proximate cause "must be adequately alleged at the pleading stage in order for the case to proceed" (citation omitted)). The Complaint lacks any allegations of any transfer, let alone one to a terrorist organization, during the relevant time period preceding the Attacks. And the very gaps in causation that were otherwise dispositive in *Rothstein* and *Al Rajhi* are also present here. In particular:

- **BNPP did not participate in the Attacks:**  As in *Rothstein*, there are no allegations here that BNPP participated "in the terrorist attacks that injured plaintiffs." *Rothstein*, 708 F.3d at 97.

- **BNPP did not provide banking services directly to terrorists:**  As in *Rothstein*, there are no allegations that BNPP provided services directly to terrorist entities. *See id.* Nor are there plausible allegations that any of BNPP's dollar-clearing transactions were used to fund terrorist activity. *Id.*

- **BNPP's actions were not necessary to any terrorism funding by Sudan:**  As in *Rothstein*, there are no non-conclusory allegations that, if BNPP had not provided dollar-clearing transactions for Sudanese banks, Sudan would not have been able to fund terrorist groups. *See id.*

- **Sudan has legitimate uses for financial services:**  As in *Rothstein*, "[t]he fact remains that [Sudan] is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

Thus, as a matter of law, the Complaint does not plead a proximate causal relationship between BNPP's conduct and the Attacks. BNPP's provision of banking services to a state sponsor of

terrorism—which is the only conduct pled in non-conclusory terms—is too indirect to satisfy the proximate cause standard.  *See id.* at 96; *Al Rajhi*, 714 F.3d at 124.

Specifically, relying entirely on the June 2014 Agreements, the Complaint alleges that BNPP provided banking services to Sudanese national banks in violation of U.S. sanctions laws, thereby facilitating these banks' access to the U.S. markets.[5]  But there is <u>nothing</u> in the June 2014 Agreements, which were the product of extensive investigations by multiple federal and state law enforcement agencies, criminal prosecutors and civil regulators, that indicates BNPP had <u>any</u> direct connection whatsoever with al Qaeda or Hezbollah.  *See* SOF, Collins Decl. Ex. A.[6]  Moreover the Complaint fails to plausibly connect the services that BNPP provided to Sudanese banks to the alleged acts of the government of Sudan by which it provided financial support to al Qaeda and Hezbollah, or to al Qaeda's and Hezbollah's purported use of Sudan's alleged support in preparing for, planning and carrying out the Attacks.[7]

The Complaint also fails to plausibly allege that U.S. dollars from any transactions conducted by BNPP for Sudanese banks were "transferred to" the terrorist groups that committed the Attacks.  *Al Rajhi*, 714 F.3d at 124; *see also Rothstein*, 708 F.3d at 97.  The Complaint tries to overcome this deficiency by alleging that BNPP Geneva became the "'*de*

---

[5] *See, e.g.*, Compl. ¶¶ 81 (In 1997, "BNPP Geneva agreed to become Sudan's prime correspondent bank in Europe.  A Sudanese national bank directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe."); 87 (In 1997, "BNPP Geneva . . . established relationships with 'satellite banks' located in Africa, Europe and the Middle East, some of whose sole purpose was to evade U.S. sanctions").

[6] To the contrary, at BNPP's sentencing for violating U.S. sanctions, an Assistant United States Attorney in charge of the prosecution of BNPP for those violations stated that, under federal terror victim restitution guidelines, the victims of the Attacks are <u>not</u> victims of the violations to which BNPP pled guilty "and cannot show that they were directly harmed by BNPP's conduct."  Transcript of Sentencing Hearing, *United States v. BNP Paribas, S.A.*, 14 Cr. 460 (LGS), May 1, 2015, at 9:19-21 (*see* Collins Decl. Ex. E).

[7] *See, e.g.*, Compl. ¶¶ 104, 110 (detailing Sudan's alleged support of al Qaeda and Hezbollah).

*facto*' bank of Sudan," *e.g.*, Compl. ¶ 83, based on BNPP's admission that the Sudanese

Government Bank "directed all major commercial banks in Sudan to use BNPP Geneva as

their primary correspondent bank in Europe," *id.* ¶ 82 (quoting SOF ¶ 19).  These allegations,

however, do not even begin to describe a mechanism by which Sudan purportedly funded al

Qaeda and Hezbollah with U.S. dollars, much less plausibly allege that any such funding

originated from transactions that BNPP processed on behalf of Sudanese banks.  To the

contrary, most of the allegations concerning Sudan's support of terrorist groups describe

logistical aid by Sudan, not any funding, much less with funds obtained from BNPP.[8]

The Complaint's allegations that the transactions BNPP processed on behalf of Sudanese

banks "result[ed] in millions of dollars being transferred by these banks . . . to terrorist groups,"

*id.* ¶¶ 126, 129, or that "[h]ad these sanctions been universally enforced against Sudanese

national banks and financial institutions controlled by Sudan in the time period of 1997-1998 the

ability of Al Qaeda and Hezbollah to plan, prepare, and carry out terrorist attacks . . . would have

been significantly reduced and the [Attacks] would not have occurred," *id.* ¶ 13, *see id.* ¶ 70, are

not only entirely conclusory, but also are precisely the same types of allegations that *Rothstein*

rejected as too remote to establish proximate cause.  The *Rothstein* complaint alleged that it was

"difficult for Iran to obtain the large sums of cash dollars needed for the Hizbollah and Hamas

operations" due to U.S. trade sanctions on Iran; that the bank defendant in that case "solved this

problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash"; and

that the defendant's provision of funds to Iran thus "substantially increased" the ability of

---

[8] *See, e.g.*, Compl. ¶¶ 104 a. (invitation to Bin Laden and al Qaeda to relocate to Sudan); 104 k. (Sudan's intelligence officers organized "to meet the needs of the Al Qaeda group in Sudan"); 104 m. (letter from president of Sudan allowing al Qaeda members to bypass tax and customs collection); 104 n. (permitting movement of weapons and explosives); 104 o. (protecting al Qaeda members from interference of Sudanese immigrations office at airport).

terrorist organizations funded by Iran to carry out the attacks. 708 F.3d at 87. The Second Circuit rejected these allegations, holding that the fact that the defendant's transfer of funds to Iran made it "more likely that the moneys would be used for terrorism" was not sufficient to adequately plead proximate cause. *Id.* at 97. As with Iran, Sudan is a "government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.* That is why, under settled ATA law, financial transactions with state sponsors of terrorism are not enough to establish civil liability to victims of any entity that such a state supports; if it were, the statutory requirement of proximate causation would be meaningless.

Finally, while the Complaint attempts to avoid the fate of the *Rothstein* complaint by repeatedly making the bald allegation that the transactions BNPP processed on behalf of Sudanese banks were "necessary for Al Qaeda and Hezbollah to plan, prepare for and to carry out" the Attack, Compl. ¶ 13,[9] that allegation does not satisfy *Iqbal*'s plausibility requirement. Rather than setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable," *Iqbal*, 556 U.S. at 678, that allegation is merely a "formulaic recitation" and a "naked assertio[n] devoid of further factual enhancement," *Sievarding*, 693 F. Supp. at 99-100, and thus inadequate to satisfy the ATA's proximate causation requirement.

Indeed, as shown above, the Complaint does not allege <u>at all</u> that BNPP processed a single transaction in the narrow window of time between the onset of the U.S. sanctions against Sudan and the beginning of BNPP's relationships with Sudanese banks in November 1997 and the date of the Attacks, August 7, 1998, <u>the only time during which Plaintiffs could theoretically even allege that BNPP proximately caused the Attacks</u>. Even if the Court were to accept the

---

[9] *See also Compl.* ¶¶ 16, 107, 123, 132, 135, 137, 140, 143, 145, 147, 149, 152, 154, 156, 157, 159, 161, 164, 167, 169, 172, 174, 176, 179, 181, 183.

indirect causation theory underlying the Complaint—that BNPP proximately caused the Attacks by processing U.S. dollar demonstrated transactions for Sudanese banks that in turn provided funding to the perpetrators of the Attacks—BNPP could have proximately caused the Attacks only by processing such transactions between November 1997 and August 7, 1998. The Complaint, however, does not identify any such transactions at all. Thus, the Complaint fails to allege any substantive "factual content" that would permit a reasonable inference that BNPP's actions were "necessary" to the Attacks.

The Court therefore should dismiss the Complaint for failure to plausibly allege proximate causation.

### C.    Section 2333 Does Not Permit Secondary Liability Claims

The Court also should dismiss the Complaint on the independent ground that it is premised on theories of secondary liability that are not cognizable under Section 2333. The Complaint bases its claims on theories of aiding and abetting and conspiracy, apparently in an attempt to mitigate its deficiencies in pleading proximate causation under the ATA.[10]  However, as all of the U.S. Courts of Appeals and the majority of the district courts that have addressed this question have repeatedly ruled, while Section 2333 permits civil claims against defendants that provide material support to terrorist organizations that commit acts of international

---

[10] *See, e.g.*, Compl. ¶¶ 2 ("These Terrorist Bombings were carried out with the assistance of Sudan aided and abetted by the Defendants"); 8 ("The Defendants . . . conspired with these Sudanese national banks and other financial institutions and entities controlled by Sudan despite knowing that these banks were transmitting the funds directly to terrorist organizations being materially supported and/or harbored and/or sheltered by Sudan, including the terrorist organizations Al Qaeda and Hezbollah."); 95 ("The Defendants knew that their conspiracy to provide Sudanese national banks access to the U.S. financial system supported terrorist organizations in . . . Sudan between 1997 and 1998."); 126 ("Defendants . . . provided Sudan, Al Qaeda and Hebollah [sic] with ongoing material support from at least 1997, continuing through August 7, 1998, by conspiring with Sudanese national banks and financial institutions controlled by Sudan to evade U.S. sanctions against Sudan, knowing that this would result in millions of dollars being transferred by these banks to Sudan and to terrorist groups, including Al Qaeda and Hezbollah, which were engaged in acts of international terrorism.").

terrorism, it does not permit the theories of secondary liability on which the Complaint relies here.

All of the U.S. Courts of Appeals that have addressed the issue of secondary liability under Section 2333 agree that there is no such liability. *See Rothstein*, 708 F. 3d at 97-98; *Boim III*, 549 F.3d at 689. In *Rothstein*, the Second Circuit held that, because Congress was "silent as to the permissibility of aiding and abetting liability" when drafting Section 2333, the statute does not permit a civil cause of action premised on an aiding-and-abetting theory of liability. 708 F.3d at 97-98; *accord Al Rajhi*, 714 F.3d at 123 (same); *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 217 (E.D.N.Y. 2013) (same). Likewise, the Seventh Circuit ruled that there is no secondary liability under Section 2333, noting that "statutory silence on the subject of secondary liability means there is none; and section 2333(a) authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors." *Boim III*, 549 F.3d at 689.[11] Numerous district courts that have considered the issue have agreed. *See, e.g., Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 455 (S.D.N.Y. 2013); *Linde*, 944 F. Supp. 2d at 217.[12]

---

[11] In *Boim III*, the Seventh Circuit sitting *en banc* overruled an earlier panel decision, *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief & Dev.*, 291 F.3d 1000, 1019 (7th Cir. 2002) ("*Boim I*"), that had erroneously distinguished *Central Bank* as limited to statutes such as Section 10(b) that create only implied private rights of action. *Boim III*, 549 F.3d at 689 ("[A]s the dissenting Justices in *Central Bank of Denver* had pointed out, the majority's holding was not limited to private actions. It encompassed suits by the SEC, which section 10(b) authorizes expressly." (citation omitted)).

[12] The few contrary opinions of courts in this District are no longer good law. The ruling in *Burnett* that there is secondary liability under Section 2333 relied on *Boim I*, which was subsequently overruled in *Boim III*. *See* 274 F. Supp. 2d at 106-08. The secondary liability claims in *Wultz* were summarily dismissed after the case was transferred to the Southern District of New York on the ground that recent case law had "categorically foreclosed" the argument that aiding and abetting liability was available under the ATA. *Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 455 (S.D.N.Y. 2013). Likewise, courts in other districts have reversed earlier rulings permitting secondary liability under Section 2333 in light of the growing body of case law finding that such liability is not cognizable. *See Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 677 (S.D. Tex. 2014) (reconsidering an earlier ruling because "the court agree[d] with the holding in *Rothstein* and *Boim* [*III*] as it pertains to aiding and abetting liability"); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Deriv. Litig., v. Chiquita Brands Int'l, Inc.*, 2015 WL 71562, at *4 (S.D. Fla. Jan. 6, 2015) (same).

In rejecting secondary liability under Section 2333, both *Rothstein* and *Boim III* properly applied the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994), which held that an "implicit congressional intent to impose . . . aiding and abetting liability in the Securities Exchange Act of 1934 could not plausibly be inferred from 'statutory silence.'"  The Supreme Court explained in *Central Bank* that since "Congress kn[ows] how to impose secondary liability when it [chooses] to do so," if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.  But it did not."  *Id.* at 176-77.  The Court's analysis rested solely on the plain text of the statute: "the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation . . . that conclusion resolves the case."  *Cent. Bank*, 511 U.S. at 177; *see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 838, 841 (2d Cir. 1998) (*Central Bank* precludes conspiracy claims under Section 10(b)).

Applying the *Central Bank* standard here, there can be no secondary liability under Section 2333 because, as in *Central Bank*, "the statute itself resolves the case."  *Central Bank*, 511 U.S. at 178.[13]  The statutory text is "'the starting point in every case involving construction of a statute,'" to which courts must adhere when considering "the scope of conduct" being prohibited.  *Id.* at 173 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (citations omitted)).  Simply put, a plaintiff may not bring suit against a defendant for acts

---

[13] Although the Court in *Central Bank* discussed and dismissed arguments raised by the parties relating to congressional intent and the legislative history of Section 10(b), it emphasized that its holding rested on an analysis that stopped at the clear text of the statute.  *See* 511 U.S. at 187-88 ("We find our role limited when the issue is the scope of conduct prohibited by the statute.  That issue is our concern here, and we adhere to the statutory text in resolving it.") (citation omitted).  Courts such as *Wultz*, 755 F. Supp. 2d at 55-57, which have relied on the ATA's legislative history in holding that secondary liability exists under Section 2333, have failed to properly end their inquiry with the clear text of the statute.  *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 501 (E.D.N.Y. 2012) (criticizing such cases).  Indeed, the legislative history of Section 2333 contains numerous assertions that are contrary to a plain reading of Section 2333.  *Gill*, 893 F. Supp. 2d at 501.

not prohibited by the text of the applicable statute. *Id.* Therefore, because Congress has not enacted a general civil liability aiding and abetting or conspiracy statute, in cases in which a statute that creates a private right of action is silent on secondary liability, "there is no general presumption" that such liability will exist. *Id.* at 182.

Section 2333 is silent as to secondary liability, and if Congress had intended to impose liability for aiding and abetting or for conspiracy, it would have done so. *See id.* at 177-78. As the *Rothstein* court noted, "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence." 708 F.3d at 97-98. Similarly, because Congress provided expressly for conspiracy liability in certain sections of the ATA, there can be no such liability under Section 2333, which lacks such an express provision. *Compare* § 2332g(c)(1) (providing criminal penalties for conspiring with an individual to violate the ATA provision prohibiting the production and possession of antiaircraft missile systems) *with* § 2339D (lacking any provision imposing liability for conspiracy to receive military-type training from a designated foreign terrorist organization). In short, the express secondary liability provisions under certain sections of the ATA dictate the conclusion that the omission of such provisions in Section 2333 reflects a deliberate choice by Congress to exclude any such liability under Section 2333. *See Central Bank*, 511 U.S. at 184 ("The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere.").

The Complaint here purports to plead the same kinds of secondary liability claims that were rejected in *Central Bank*, *Rothstein* and *Boim III*. Specifically, because the Complaint cannot allege that BNPP provided direct material support to al Qaeda and Hezbollah, it instead

25

attempts to plead that BNPP aided and abetted Sudanese banks' provision of material support to those terrorist organizations. Likewise, the Complaint does not contend that BNPP directly funded the perpetrators of the Attacks, but rather that BNPP conspired with the Sudanese banks that purportedly funded those organizations. *Central Bank* precludes Plaintiffs' contention: Section 2333 is silent on secondary liability, and there is consequently no secondary liability under the statute. Because the Complaint is predicated solely on secondary liability theories under Section 2333, the Court must dismiss it.[14]

### D.  The Complaint Cannot Assert A Claim Under Section 2339C Of The ATA Because That Provision Was Enacted After The Attacks

Further, to the extent the Complaint's claims under Section 2333 are predicated on conduct by BNPP that allegedly violated Section 2339C of the ATA, *see* Compl. ¶ 116, they should be dismissed because that provision was enacted well after the Attacks occurred, and cannot be applied retroactively. *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2001, Public Law 107-197, 116 Stat. 721 (June 25, 2002); *Boim III*, 549

---

[14] Even if secondary liability were viable under the ATA, the Complaint still would need to be dismissed for failing to properly plead the requisite elements of such liability. For example, aiding and abetting liability requires that "the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The Complaint alleges that "Terrorist Bombings were carried out with the assistance of Sudan aided and abetted by the Defendants," Compl. ¶ 2, but it fails to allege both that Defendants knowingly supported the Attacks and that they substantially assisted those who carried out the Attacks. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 110 (D.D.C. 2010) ("Simply stating that the [Defendants] generally provided aid to a third party, who in turn purportedly engaged in tortious activity, is not enough; rather, the plaintiffs are required to plead a link between the aid rendered and the principal violation (or violations) alleged.").

Similarly, a conspiracy claim requires "proof of a 'common and unlawful plan whose goals are known to all members.'" *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002) (quoting *Hobson v. Wilson*, 737 F.2d 1, 55 (D.C. Cir. 1984)). Although the Complaint alleges that Defendants participated in a conspiracy "with each other and with Sudanese national banks, and other financial institutions and entities controlled by Sudan . . . to move billions of dollars through the U.S. financial system," Compl. ¶ 7; *see also id.* ¶ 8, nowhere does the Complaint plausibly allege that BNPP shared a common goal with its purported co-conspirators, to carry out the Attacks with the intent "to compel the United States Government to withdraw from Africa and the Middle East." *Id.* ¶ 4; *see Sievarding*, 693 F. Supp. 2d at 100.

F.3d at 691 (holding that, to state a Section 2333 claim predicated on a violation of 2339A, plaintiff must show that defendant provided material support "between the effective date of section 2339A and" plaintiff's injury).

## II.    THE COMPLAINT DOES NOT ALLEGE ANY WRONGDOING BY BNPP NORTH AMERICA

Finally, the claims against BNPP North America, an indirect subsidiary of BNPP Paris, should be dismissed because the Complaint contains no non-conclusory allegations against that entity.[15]   *Twombly*, 550 U.S. at 554-58.  A complaint cannot "lump[ ] all the defendants together in each claim" without providing "each defendant with fair notice of each claim and its basis." *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (internal quotations omitted); *see also Bond v. U.S. Dep't of Justice*, 828 F. Supp. 2d 60, 76 (D.D.C. 2011) (plaintiff must "plead the involvement of each defendant" in order to give defendants notice of constitutional violation); *Morton v. D.C. Housing Auth.*, 720 F. Supp. 2d 1, 9 n.3 (D.D.C. 2010) ("group pleadings" that fail to "plead facts with the requisite specificity" do not survive a motion to dismiss) (internal quotations omitted).

Here, the Complaint tacks BNPP North America onto all of the allegations concerning BNPP's purported conspiracy, but fails to include any non-conclusory factual allegations about BNPP North America's involvement in any of the wrongful conduct alleged.  *See id.* ¶¶ 7-21, 36, 77-99.  The Complaint provides no actual support whatsoever for the blanket and conclusory contention that BNPP North America "moved billions of dollars through the U.S. banking system on behalf of sanctioned entities to evade U.S. sanctions against Sudan on behalf of terrorist organizations, including Al Qaeda and Hezbollah."  *Id.* at ¶ 36.  Further, the June 2014

---

[15] BNP North America is also referenced in the Complaint as "BNPP U.S." and "BNPP U.S.A."  *See, e.g.*, Compl. ¶¶ 2, 6.

Agreements do not mention BNPP North America at all, BNPP North America was not a party to the June 2014 Agreements, and it was never charged with or convicted of any violations of any U.S. sanctions against Sudan. Nor did BNPP Paris admit to any misconduct by BNPP North America.[16]

Because the Complaint fails to adequately plead any facts of any kind as to BNPP North America's purported participation in the conduct at issue, the claims against BNPP North America should be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Complaint in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[16] BNPP North America is not the entity referred to as "BNPP New York" in BNPP's plea agreement with the U.S. Department of Justice. "BNPP New York" refers to the New York branch of BNPP Paris. *See* SOF ¶ 1, Exhibit A to Collins Decl. ("BNPP has subsidiaries, affiliates and branches in many countries throughout the world, including branch offices in the United States headquartered in New York ("BNPP New York") . . . .").

Dated: January 29, 2016
         Washington, D.C.

                                     Respectfully submitted,

                                     CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                By: _/s/ Alexis Collins_____
                                     Alexis Collins (D.C. Bar # 474599)
                                     2000 Pennsylvania Avenue, N.W.
                                     Washington, D.C. 20006
                                     (202) 974-1500
                                     alcollins@cgsh.com

                                   Jonathan I. Blackman (_pro hac vice_)
                                   Lawrence B. Friedman (_pro hac vice_)
                                   Carmine D. Boccuzzi, Jr. (_pro hac vice_)
                                   Avram E. Luft (_pro hac vice_)
                                   Mark S. Grube (_pro hac vice_)
                                   One Liberty Plaza
                                   New York, New York 10006
                                   (212) 225-2000

                                  Attorneys for Defendants BNP Paribas S.A., BNP North America, Inc. and BNP Paribas (Suisse) S.A.

29