# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**JAMES OWENS, et al.,**

        **Plaintiffs,**

**v.**                                  **Civil No. 15-1945 (JDB)**

**BNP PARIBAS S.A., et al.,**

        **Defendants.**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

## Introduction

Defendant BNPP acknowledges that it pleaded guilty to conspiring to launder money for Sudan, using its wholly-owned subsidiaries in Geneva and New York to give a terrorist nation access to staggering amounts of money.[1] BNPP notes, "Based on the detailed factual statements that are part of the June 2014 Agreements, the Complaint alleges that BNPP conspired with Sudanese banks to 'concea[l] U.S. dollar transactions using the U.S. financial system on behalf of banks and other entities located in or controlled by Sudan in violation of U.S. sanctions against Sudan,'" Def. BNPP's Mot. to

---

[1] Plaintiffs recognize that Defendants deny that all of them acted in conspiracy and that Defendants assert arguments pertinent only to individual defendants. Plaintiffs will treat those particular assertions individually, but otherwise, for ease of expression, will refer to Defendants, collectively, as BNPP.

Dismiss the 1st. Am. Compl., Jan. 29, 2016, ECF No.17, 4 [hereinafter BNPP's Mot.], but argues that because its guilty plea covers only the period after 2002, it is implausible to believe that its conduct could have "proximately caused the Attacks, which occurred four years earlier." *Id.*

In those same agreements, however, it admitted that it began in 1995 to hide currency manipulations on behalf of terrorist parties, BNPP's Mot., Ex. B, at ¶5, and that its conspiracy began in 1997, *id.* at ¶¶15-17, the year prior to the embassy bombings. It suggests that, as a matter of unestablished fact, activity during this period was limited to "the initial establishment of certain banking relationships." BNPP's Mot., 5. That suggestion does not render Plaintiffs' allegations implausible.

BNPP admits that its felonious conspiracy to aid Sudan operated at a time when Sudan actively was advancing the terrorist conspiracy adjudged to have caused the harm for which Plaintiffs seek redress. Plaintiffs have pleaded that BNPP provided material support to Sudan, which enabled Sudan to provide material support to the terrorists who immediately planned and executed the bombings. Compl. ¶¶ 107, 110, 118. This Court already has found that Sudan's support "was critical to the success of the 1998 embassy bombings." Pls.' Mem. Supp. Summ. J., Feb. 2, 2016, ECF No. 22-1 [hereinafter Pls.' Mem.] Ex. 7, at 26. BNPP also admits that its conspiracy purposefully thwarted sanctions designed to prevent the harm that Plaintiffs suffered. BNPP's admissions, alone, render Plaintiffs' allegations of BNPP's responsibility plausible, powerfully so when coupled with other factual assertions Plaintiffs have pleaded. BNPP's motion must

be denied, and at the very least[2] BNPP must be compelled to reveal truths about its
conspiracy that remain hidden.

## Argument

# I. Plaintiffs' complaint states claims under the Anti-Terrorism Act.

## A. Plaintiffs' complaint is timely filed.

Plaintiffs' complaint was filed more than ten years after the occurrence of the acts
giving rise to their harm, thus seemingly outside the ten year statute of limitations
provided by the Anti-Terrorism Act (ATA).  18 U.S.C. § 2335.  Defendants argue that
Plaintiffs are not entitled to have the statute equitably tolled, relying in part on *Phillips v.
Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993).  BNPP's Mot., 10.  But equitable estoppel,
not equitable tolling, is at issue here, as Defendants have admitted a furtive criminal
conspiracy that they actively concealed.  BNPP's Mot., Ex. A, at ¶¶ 23-24.  Equitable
tolling is at issue only when *neither* party is at fault in causing delay.  *Phillips*, 984 F.2d
at 492. "Equitable tolling thus contrasts with equitable estoppel, which is applied where
the plaintiff's delay arises out of the defendant's fault...".  *Id.* at n.3.

Where a "plaintiff did not discover the injury because the defendant fraudulently
concealed material facts related to its wrongdoing, then the court will deem the cause of
action not to have accrued during the period of such concealment." *Sprint Commc'ns Co.
L.P. v. F.C.C.,* 76 F.3d 1221, 1226 (D.C. Cir. 1996).  Under this circumstance, "the
limitations period starts to run on 'the first date that the injured party possesses sufficient

---

[2] On February 2, 2016, Plaintiffs filed a Motion for Summary Judgment, expressing their belief
that uncontested facts not only plausibly assert, but by a preponderance of evidence demonstrate,
the responsibilities Defendants deny here.

critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress.'" *U.S. ex rel. Miller v. Bill Harbert Int'l Const.*, 505 F. Supp. 2d 1, 7 (D.D.C. 2007).

Defendants put the key date of discovery on June 30, 2014, when its plea agreements were "widely published." BNPP's Mot., 10. There is no indication that Plaintiffs' cause of action accrued at any earlier date. Defendants note that this suit was commenced 16 months later, *id.*, putting it well within the ten year statute of limitations of the ATA.

## B. Plaintiffs' complaint plausibly alleges facts that fulfill the causal requirements of the ATA.

BNPP makes two related arguments regarding causality: that a strict version of common law proximate cause applies to actions under the ATA and that the ATA provides no cause of action for indirect, or aiding and abetting, liability. Its arguments fail to account for a critical 2011 Supreme Court decision guiding construction of remedial statutes like the ATA and ignore the position of the United States that indirect causation and indirect liability are recognized under the ATA.

BNPP argues that Plaintiffs "must plausibly plead that BNPP's actions proximately caused the attacks," BNPP's Mot., 11. At issue is what "proximate cause" means – a "notoriously confusing" question, *CSX Transportation, Inc. v. McBride*, 131 S. Ct. 2630, 2642 (2011) – in the context of the ATA. BNPP posits that Plaintiffs must plead that BNPP's actions "led directly to" their injuries, BNPP's Mot., 11, and that Plaintiffs' pleading does not meet this proximate cause standard because it alleges only

indirect support for terrorist acts. *Id.* at 11-13. There is, however, no textual requirement in the ATA that a defendant's actions "led directly to" harm to plaintiffs. The ATA requires that injury occur "by reason of" Defendants' conduct. 18 U.S.C. §2333(a).

BNPP finds support for its position in cases from other circuits interpreting the ATA and in cases such as *BCCI Holdings (Luxembourg), S.A. v. Khalil*, 214 F.3d 168, 173 (D.C. Cir. 2000), which interpreted the causal language of the Racketeer Influenced and Corrupt Organizations (RICO) Act – "by reason of," the same language found in the ATA. BNPP's Mot., 11. The cases on which BNPP primarily relies in turn rely on *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), which interpreted "by reason of" in RICO. *CSX Transp.* distinguished *Holmes* in a way that drains vitality from BNPP's supporting authorities. *CSX Transp.*, 131 S.Ct. at 2642.

In *CSX Transp.* the defendant in a Federal Employers' Liability Act (FELA) case urged error in failing to instruct a jury that proximate cause was necessary to find liability. *Id.* FELA provides for liability for injuries "'resulting in whole or part'" from negligence. *Id.* at 2636 (quoting 45 U.S.C. § 51). The defendant maintained that the correct definition of proximate causation was a "'direct relation between the injury asserted and the injurious conduct alleged,'" *id.* at 2635 (quoting *Holmes*, 503 U.S. at 268). The Court explained that proximate cause is merely the embodiment of a policy judgment regarding when conduct should lead to liability, *id.* at 2636-37, a policy judgment that can vary with the purposes of statutes. The Court detailed the many definitions of proximate cause to be found at common law, and the difficulties explicating those definitions, *id.* at 2642, and bemoaned the too-frequent use of the ambiguous term by Congress. *Id.* Critically, it held that "when the legislative text uses

less legalistic language, *e.g.,* 'caused by,' 'occasioned by,' 'in consequence of,' or, as in FELA, 'resulting in whole or in part from,'" or, as here, "by reason of," "and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate-cause formulations." *Id.* at 2642-43. *CSX Transp.* instructs that under the ATA, which uses less legalistic language and which has a purpose of loosening restraints on recovery, *see, e.g., Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 56 (D.D.C. 2010), proximate cause should not be narrowly construed in the way BNPP posits.

A more restrictive version of proximate cause was justified in *Holmes*, even with less restrictive "by reason of" statutory language, because there was, in the words of *CSX Transp.*, "reason for courts to hark back to stock, judge-made proximate-cause formulations" that require more direct causation than required under FELA or the ATA. Unlike in FELA, or in the ATA, in RICO Congress intended to import restrictive causation standards, standards well-established under antitrust law. *Holmes*, 503 U.S. at 267-69. Congress announced no such intent in the ATA. Nor does the ATA present complications arising, in antitrust law, from apportioning damages among "plaintiffs removed at different levels of injury from the violative acts," *id.* at 269, one reason the *Holmes* court cited for a constrictive reading of statutory language. Another reason was the absence, under the antitrust laws, of a need to vest persons indirectly damaged with a right to recover because "directly injured victims can generally be relied upon to vindicate the law." *Id.* The purposeful Congressional scheme of countering terrorism through private rights of action, *Wultz*, 755 F. Supp. 2d at 56, would be thwarted absent enforcement by persons similarly situated to Plaintiffs.

Like FELA, the purpose of the ATA is to "loosen constraints on recovery." *CSX Transp.,* 131 S. Ct. at 2642-43. *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013), on which BNPP relies, noted, "the legislative history of the ATA indicates that Congress intended to create impediments to terrorism by 'the imposition of liability at any point along the causal chain of terrorism.'" Despite this broad Congressional purpose, the *Rothstein* court imposed a causation standard like the one BNPP proposes here, concluding from an analysis of *Holmes* that the "'by reason of' language had a well-understood meaning, as Congress had used it in creating private rights of action *under RICO and the antitrust laws*, and it had historically been interpreted as requiring" direct causation. *Id.* (emphasis added). *Rothstein* does not discuss the intervening decision in *CSX Transp.*, which made clear that the rationale of *Holmes* was limited by the unique statutory history of RICO and is not applicable to the ATA.

The "led directly to" standard of causation proposed by Defendants is not consonant with, and is more constrictive than, "by reason of" as employed in the ATA. The U.S. Government, in what the Seventh Circuit described as a "very helpful *amicus curiae* brief" in a case also involving funding of terrorism, *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (*Boim I*), proposed that harm was caused "by reason of" a defendant's actions "if the plaintiff can show that the provider of funds was generally aware of the donee's terrorist activity, and if the provision of funds substantially assisted the terrorist act in question. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)." *Boim I,* 291 F.3d at 1012.[3] *CSX Transp.* makes clear that the standard proposed by the United States in *Boim I*

---

[3] The Brief of the United States is available at 2001 WL 34108081. For convenience it is attached here as Exhibit A.

accurately interprets the words of Congress and the intent those words express. After analyzing the legislative history of the ATA, the United States concluded, "[T]he development of Section 2333(a) makes it clear that Congress acted to give terrorism victims a sure civil cause of action that would incorporate the law of torts in general, and the tort principles of aiding/abetting liability in particular." Brief for the United States as Amicus Curiae, 2001 WL 34108081, at *16. A "restrictive reading of the statute," as Defendants propose here, "would mean that Congress created a largely hollow remedy if it merely allows suits against terrorists who pull the trigger or plant the bomb. Obviously, such persons will rarely have more than minimal assets to attach, and will likely not be dissuaded in advance by the threat of a later civil suit. By contrast, organizations that fund terrorist entities are much more likely to have assets they wish to protect, and will thus be far more concerned about later legal actions holding them liable for terrorist acts. Liability under Section 2333(a) should be imposed 'at any point along the causal chain of terrorism, [because] it would interrupt, or at least imperil, the flow of money.' S. Rep. 102-342, at 22." *Id.* at *18. The standard proposed by the United States "better advances Congress' goal of providing compensation for, and deterrence against, acts of international terrorism." *Id.* at *18-19.

The *Boim I* court, influenced by *Holmes*, slightly modified the standard proposed by the United States, finding that harm was caused "by reason of" a terrorist act if the harm "was a reasonably foreseeable result of" providing financial support to the terrorist. *Boim I*, 291 F.3d at 1012. While that standard is narrower than the one proposed by the United States it is still broader than the "led directly to" standard proposed here by BNPP. Judge Lamberth alluded to *Boim I* in finding, in *Wultz*, 755 F. Supp. 2d at 53, that

the proximate cause requirement of the ATA is satisfied by demonstrating that a plaintiff's injuries "'might have reasonably been anticipated as a natural consequence of the defendant's actions.'"  Judge Lamberth found that the plaintiffs pleading that a bank "knew that it was providing financial services to an agent of [a terrorist party], and that the [terrorist party] would use those funds for the sole purpose of engaging in terroristic violence" satisfied the requirement.  *Id.*  In making this finding Judge Lamberth alluded to his analysis of causation for purposes of standing, where he found proximate cause satisfied by allegations:

- [that the terrorist party] "is subject to strict economic sanctions programs imposed by the United States as the result of its designation" as a foreign terrorist organization and specially designated global terrorist entity, the enforcement of which is intended to limit the [terrorist party's] "ability to plan, to prepare[,] and to carry out terrorist attacks." …

- [that had sanctions been] universally enforced by financial institutions… "the ability of [the terrorist party] to conduct banking activities would be severely restricted, and [the terrorist party's] ability to plan, to prepare[,] and to carry out terrorist attacks would be significantly reduced."

- that "very few banks and financial institutions … do not observe and enforce the U.S. Sanctions Regime," among which is [the defendant bank].

- [that defendant bank] "executed dozens of ... wire transfers ...

  totaling several million dollars" on behalf of [the terrorist party],

  which were "necessary for planning, preparing and carrying out"

  the attack for which relief is sought.

*Id.* at 23.

Judge Lamberth cited with approval *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631-32 (E.D.N.Y. 2006), which held, "A showing of proximate cause requires plaintiffs to show that defendant's actions were 'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" The court analyzed legislative history to help give content to the words "by reason of":

> Congress intended these provisions to impose, "liability at any point along the causal chain of terrorism." S.Rep. No. 102–342 at 22. In enacting the material support statute Congress made an express finding of fact that, "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). As the Ninth Circuit has noted, "money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." *Humanitarian Law Project v. Reno*, 205 F.3d at 1136 [cert. den., 532 U.S. 904,]; *see also Linde*, 384 F. Supp. 2d at 585 (holding that in order to prevail on claims under 2333(a) it was sufficient for plaintiffs to show that "the Bank provided these services to the particular group responsible for the attacks giving rise to their injuries.").

*Weiss*, 453 F. Supp. 2d at 631-32.

The District Court in *Weiss* ultimately dismissed on summary judgment, finding that plaintiffs had not met the scienter requirement of 18 U.S.C. §2339B(a)(1). *Weiss v. Nat'l Westminster Bank, PLC*, 936 F. Supp. 2d 100, 103 (E.D.N.Y. 2013) vacated and

remanded, 768 F.3d 202 (2d Cir. 2014).  The Second Circuit reversed the scienter ruling, finding sufficient a complaint that accused a bank of "providing material support and resources to a foreign terrorist organization by maintaining bank accounts and transferring funds for" an entity, like Sudan, specially designated as involved in terrorism, that "engaged in 'terrorist activity' by soliciting funds, and otherwise providing support, for Hamas," a terrorist organization.  *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 204-05 (2d Cir. 2014).  The scienter requirement was met by an assertion that the defendant "exhibited deliberate indifference" to whether the funds it provided were used to support terrorism, *id*. at 208, a standard the court described as lenient.  *Id*. at 211.[4]

The pleadings here readily meet the requirements of *Boim I*, *Wultz*, and *Weiss*.  Plaintiffs have alleged that BNPP flouted laws designed to preclude Sudan from engaging in terrorism; effectively became Sudan's national bank; and enabled Sudan and its partners in terrorism to perform the embassy bombings.  They have pleaded or BNPP has admitted:

- BNPP's complicity with international terrorism began at least as early as 1995, when it began hiding transactions with Iran.  BNPP's Mot., Ex. B, at ¶ 5.

- In 1997 sanctions were imposed against Sudan, intended to limit the ability of known terrorist organizations, including al Qaeda and Hezbollah, to plan, prepare for, and carry out acts of international terrorism.  Compl. ¶ 10.

- BNPP was well aware of the existence and objective of these sanctions but elected not to comply with them.  *Id.* ¶¶ 11, 15.  Instead, they conspired with

---

[4] On summary judgment the District Court did not address an assertion by the defendant bank that the plaintiffs had failed to establish a triable issue of fact with regard to proximate cause; the Court of Appeals did not address proximate cause, either.  *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 204 (2d Cir. 2014).  Citation to *Weiss* is notably absent from the brief of BNPP, whose counsel here also were counsel for defendants in *Weiss*.

Sudanese banks and financial institutions to launder money, with the knowledge that proceeds were being transmitted to the terrorist organizations Sudan was harboring. *Id.* ¶¶ 7, 8.

- By January 1, 1998, long before the embassy bombings, OFAC had designated all of Sudan's national and major commercial banks Specially Designated Nationals. *Id.* ¶67.

- All major commercial banks in Sudan, when directed by a Sudanese national bank, used BNPP Geneva as their primary correspondent bank in Europe. *Id.* ¶ 81.

- BNPP became the de facto bank of Sudan, and its services, by its admission, were critical to the government's financial stability. *Id.* ¶ 95.

- BNPP knew that assistance provided to Sudan would be used for terrorist purposes. *Id.* ¶¶ 45 f., k.

- Millions of dollars from Sudanese-controlled banks and financial institutions involved in BNPP's scheme were obtained by al Qaeda and Hezbollah, which enabled them to carry out terrorist activities. *Id.* ¶ 16.

- As head of state, Omar Hassan al-Bashir ran the government of Sudan through an alliance of the military and the National Congress Party (formerly known as the National Islamic Front), a militant Islamic group focused on spreading Sha'aria law by any means necessary, including the use of violence. *Id.* ¶¶ 57, 58, 104 b.

- In providing financial services to a terrorist-supporting regime, it is impossible to separate trade for legitimate purposes from trade for terrorism purposes. *Id.* ¶ 59.

- Sudan's government was not only providing safe harbor for terrorists; it was directly involved in planning terrorist attacks. *Id.* ¶ 55.

- Terrorists came to Sudan based on promises by Sudanese government officials that it would provide them with government support. *Id.* ¶ 104.

- This support included a protective relationship between Sudanese intelligence and al Qaeda, which was authorized in writing by President al-Bashir. *Id.* ¶¶ 104 h.-j.

- The Sudanese military provided security and transportation for terrorist weapons and explosive shipments, both within the country and internationally.  President al-Bashir explicitly authorized this protection, which allowed terrorists to bypass tax and customs collection as well as port inspections. *Id.* ¶¶ 104 l.-n.

- A member of the ruling Islamic National Front facilitated travel for terrorist organizations and provided them with economic aid. *Id.* ¶ 104 v.

- Terrorist organizations manufactured chemical weapons for the Sudanese government to use against rebels in Southern Sudan; provided communications equipment and weapons to the Sudanese army; provided logistical support to the Sudanese government, and on at least one occasion, a senior Al Qaeda member worked directly for the Sudanese government by spying on a government opposition leader. *Id.* ¶¶ 104 t., u.

The pervasiveness of terrorism in Sudan, and the status of BNPP as the de facto national bank of the terrorist state, render plausible Plaintiffs' assertions that BNPP's actions caused the harm Plaintiffs suffered.

That discussion of proximate cause is germane to discussion of the second causation issue raised by BNPP, whether § 2333 authorizes a claim for secondary, or

aiding and abetting, liability.  BNPP's Mot., 22 *et seq*.  BNPP notes, "[a]ll of the circuits"
that have addressed the issue have found in the negative.  *Id*. at 23.  There are only two
precedential circuit decisions, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d
685, 689 (7th Cir. 2008) (en banc) (*Boim III*), and *Rothstein,* 708 F.3d at 95, and only one
rationale; *Rothstein* discusses the question only briefly and adds nothing to the rationale
of *Boim III*.  *Rothstein,* 708 F.3d at 98.  *Boim III* was extant when *Wultz* was decided and
Judge Lamberth considered, and respectfully rejected, its rationale.  *Wultz,* 755 F. Supp.
2d at 56-57.

   *Boim III* noted that the text of § 2333 did not specifically authorize secondary
liability and, relying primarily on *Central Bank of Denver, N.A. v. First Interstate Bank
of Denver, N.A.*, 511 U.S. 164 (1994), found, therefore, "statutory silence on the subject
of secondary liability means there is none."  *Boim III,* 549 F.3d at 689.  Judge Lamberth
read *Cent. Bank* more closely.  While "generally hesitant to imply secondary aiding-and-
abetting liability under the ATA in light of" *Cent. Bank, Wultz,* 755 F. Supp. 2d at 54, he
noted that *Cent. Bank* held only that, in construing a statute silent on the subject, "'there
is no general presumption that the plaintiff may also sue aiders and abettors.'"  *Id.* at 55.
He continued, "[h]owever, this is only a presumption, and the Court held that the
availability of a claim should ultimately be guided by 'whether aiding and abetting is
covered by the statute.'"  *Id.*  Carefully reviewing statutory history, he found that the
presumption is rebutted in the ATA "because Congress expressly created a private right
of action under the ATA, Congress intended to incorporate common principles of tort
law, and to refuse to recognize aiding-and-abetting liability would stymie Congress's
intent."  *Id.*

Judge Lamberth noted that, at that time, *Boim III* was the only court that had declined to find secondary liability under the ATA, *id.* at 56, with six other courts having considered the issue and having decided otherwise. *Id.*, citing *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig.*, 690 F. Supp. 2d 1296, 1309-10 (S.D. Fla. 2010); *Linde v. Arab Bank, P.L.C.*, 384 F. Supp. 2d 571, 583 (E.D.N.Y. 2005); *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *3 (E.D.N.Y. 2006); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *9 (E.D.N.Y. 2006); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1330 (D. Utah 2006); and *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105–07 (D.D.C. 2003)(*Burnett I*). He concluded, "The Court is thus strongly persuaded that secondary liability exists under the ATA." *Wultz*, 755 F. Supp. 2d at 56.

Since *Wultz* was decided, the District of Columbia and Utah cases have maintained their vitality. The New York cases have been overruled by *Rothstein*. The district court in *Chiquita Brands Int'l* recently reconsidered its ruling and, without further analysis, perfunctorily noted that it was persuaded by the Second Circuit's reasoning in *Rothstein*. *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, No. 08-01916-MD, 2015 WL 71562, at *5 (S.D. Fla. Jan. 6, 2015). The analysis of *Rothstein*, which is simply an adoption of the analysis in *Boim III*, has no persuasive power beyond that of *Boim III*. *Boim III*, as Judge Lamberth noted, was based on a too-narrow construction of *Cent. Bank.* *See* Brief of the United States, discussed *infra.* at *18 ("[D]efendants' contrary restrictive reading of the statute would mean that Congress created a largely hollow remedy if it merely allows suits against terrorists who pull the trigger or plant the bomb.") Because the ATA, unlike Section 10(b)(5) of the Securities Act at issue in *Cent. Bank,* creates a private right of action; because Congress intended

that general principles of tort law, as described in *Halberstam v. Welch*, 705 F.2d 472,

477 (D.C. Cir. 1983), be applied under the ATA; because Congress had broad remedial

and deterrent purposes to be served by its authorization of private rights of action under

the ATA; and because those purposes would be thwarted by failing to recognize a claim

for secondary liability, the presumption that the ATA did not create such a claim must be

found to be rebutted.

## C. The complaint alleges that BNPP North America, Inc., participated in the BNPP conspiracy and it appropriately is a party here.

BNPP asserts that BNPP North America is not appropriately a party.  BNPP's

Mot., 27. BNPP has admitted it conspired with others, Pls.' Mem., Ex. 4, at ¶ 1, and

acknowledges that BNPP North America is alleged to have been a co-conspirator.

BNPP's Mot., 27.  How BNPP North America engaged in the conspiracy also is alleged,

as matters of fact subject to proof by evidence, *e.g.*, whether it laundered money on

behalf of terrorist organizations.  *Id.*, and Complaint paragraphs cited there.

BNPP asserts that BNPP North America is not the party referred to as BNPP New

York in the June 2014 Agreements.  BNPP's Mot., 28, n.16.  That is a factual dispute not

appropriate for resolution by motion to dismiss.

## D. The broad remedial purpose of the ATA and constitutional values require that Plaintiffs' pleading be construed to satisfy Fed. R. Civ. P. 8.

Chief Justice Marshall, in *Marbury v. Madison*, 5 U.S. 137, 163 (1803), observed,

"The very essence of civil liberty certainly consists in the right of every individual to

claim the protection of the laws, whenever he receives an injury.  One of the first duties

of government is to afford that protection." In passing the ATA Congress was discharging that duty, assuring that Plaintiffs could exercise their fundamental First Amendment right to petition the government for redress. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 131 S. Ct. 2488, 2494 (2011). Fed. R. Civ. P. 1 and Fed. R. Civ. P. 8 are tools by which the governmental duty is discharged and the constitutional right is implemented. They should be construed to assure that the courthouse door is not quickly closed to serious petitioners.

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1939 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, (2007) introduced plausibility to pleading but did precious little to give meaning to the new requirement. Commentators have expressed deep concern about subjectivity inherent in the new pleading standards, which allow a district court judge to dismiss a case by drawing on his or her "judicial experience and common sense," *Iqbal*, 129 S. Ct. at 1950 – and the potential for erosion of constitutional values. "By leaving the notions of abusive discovery and meritless litigation undefined in *Twombly* and *Iqbal* while simultaneously encouraging judges to factor concerns about them into their Rule 12(b)(6) decisions, the Court has authorized judges to let their own views and attitudes regarding these phenomena influence their decision-making. This virtually unbridled discretion is inappropriate. It compounds the subjectivity inherent in the plausibility inquiry. And when exercised at the threshold of a case, it may undermine historic norms and debilitate the private enforcement of important substantive policies, as well as constitutional due process and jury-trial rights." Arthur R. Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 83 (2010). *See also, e.g.*, Stephen B. Burbank et. al.,

*Plausible Denial: Should Congress Overrule Twombly and Iqbal?*, 158 U. Pa. L. Rev. PENNumbra 141, 148 (2009) (Burbank at 148 suggesting that "access to court, the right to a jury trial, [and] whether our society remains committed to private litigation as a means of securing compensation for injury and enforcing important social norms" are implicated by *Iqbal* and *Twombly*, and at 152-53 noting the possible incursion on the constitutional role of the jury and the "risk that judges assessing the plausibility of complaints will fail to recognize the influence of their cultural predispositions."); A. Benjamin Spencer, *Pleading and Access to Civil Justice: A Response to Twiqbal Apologists*, 60 UCLA L. Rev. 1710, 1723-24 (2013) (subjectivity in plausibility standard "was foreign to the pre-*Twombly* heightened pleading approaches and will yield a level of unpredictability that assures inconsistent results while encouraging increased motion practice..."). The newest and broadest empirical study of the effects of *Iqbal* and *Twombly* powerfully establishes that the commentators had reason to express concern. Alexander A. Reinert, *Measuring the Impact of Plausibility Pleading*, 101 Va. L. Rev. 2117, 2122 (2015). The new and subjective power to dismiss cases based on plausibility must be used cautiously.

Here, we know that, in 1997, Sudan was in financial shambles, run by an autocratic madman hell-bent on advancing the agenda of radical terrorists seeking to remove all traces of America from the Mideast and Africa. Compl. ¶¶ 57, 58, 101, 104 b. We know that, in conscious violation of sanctions designed to keep money from his hands, BNPP engaged in a conspiracy that ultimate allowed him and his ilk access to billions of American dollars. BNPP's Mot., Ex. B, at ¶ 25. We know that at least two years before that conspiracy began BNPP was instructing its agents to hide money

laundering on behalf of another terrorist party, Iran, which itself was involved in conspiracy with Sudan. *Id.* at ¶ 5. Plaintiffs, on the information they do know and the beliefs formed from them, have pleaded facts that causally link BNPP to the harm Plaintiffs suffered. *See Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010). Plaintiffs' pleading is sufficient to meet the "relatively low standard" of plausibility under *Iqbal. Evangelou v. D.C.,* 901 F. Supp. 2d 159, 170 (D.D.C. 2012) ("*Twombly* and *Iqbal* do not require an inference of culpability to be the only inference that could be drawn—only that it be among the set of plausible inferences. [Plaintiff] has met that relatively low standard"), a standard that must be gently applied to maintain a level playing field in litigation when information is asymmetrically available. *See* Miller, *From Conley to Twombly to Iqbal, supra,* 45-48; Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions to Dismiss,* 6 Fed. Cts. L. Rev. 1, 30 (2011).

A motion to dismiss poses the question, at what threshold should the government lend coercive investigative power to a plaintiff? Given the constitutional values at stake, and the intent of Congress to give Plaintiffs remedies and to rely on private enforcement to stem the tide of terrorism, the Plaintiffs' allegations here should be deemed to assert a plausible claim, and to invest Plaintiffs with the power, always under the control of the Court, *see,* Elizabeth Thornburg & Camille Cameron, *Defining Civil Disputes: Lessons from Two Jurisdictions,* 35 Melb. U. L. Rev. 208, 235 (2011) (advocating "a structured process of court-led conversations that identify the parameters and needs of litigation."), to compel BNPP and others to provide evidence that will show whether the plausible version of events Plaintiffs plead is, ultimately, true.

# CONCLUSION

For these reasons, BNPP's Motion to Dismiss must be DENIED.


March 2, 2016                          Respectfully submitted,

                                       Fay Law Group, PA

                                       By: _____

                                       Thomas Fortune Fay
                                       D.C. Bar No. 23929
                                       *ThomasFay@aol.com*


                                       By: _____

                                       John Vail, of Counsel,
                                       D.C. Bar No. 461512
                                       *john@johnvaillaw.com*

                                       Attorneys For Plaintiffs
                                       Counts I - XXI
                                       Fay Law Group, PA
                                       777 Sixth Street NW, #410
                                       Washington, DC  20001
                                       202/589-1300
                                       Fax: 202/589-1721


                                       Bond & Norman Law, PC


                                       By: _____

                                       Jane Carol Norman
                                       D. C. Bar No. 38403
                                       *janenorman@bondandnorman.com*
                                       777 Sixth St. NW #410
                                       Washington, DC 20001
                                       202/682-4100
                                       Fax: 202/207-1041
                                       Attorney For Plaintiffs
                                       Counts XXII – XXIV

## CERTIFICATE OF SERVICE

I hereby certify that all counsel who have entered an appearance in the foregoing case have been served with the above Plaintiffs' Response through the Court's Electronic Filing System.

Thomas Fortune Fay